1 ███████████████████████████

2 CLAIRE M. SYLVIA (State Bar No. 138990)
cms@pcsf.com
3 PHILLIPS & COHEN LLP
131 Steuart Street, Suite 501
4 San Francisco, California  94105
Tel: (415) 836-9000
5 Fax: (415) 836-9001

6 PETER CHATFIELD
peter@phillipsandcohen.com
7 PHILLIPS & COHEN LLP
2000 Massachusetts Avenue
8 Washington, DC  20036
Tel: (202) 833-4567
9 Fax: (202) 833-1815

10 L. TIMOTHY TERRY, admitted *pro hac vice*
tim@theterrylawfirm.com
11 THE TERRY LAW FIRM LTD.
P.O. Box 2348
12 Carson City, NV  89702
Tel: (775) 883-2348
13 Fax: (775) 883-2347

14

15 Attorneys for *Qui Tam* Plaintiff [under seal]

16

| | **FILED** |
|---|---|
| | **Dec 20, 2011** |
| | CLERK, U.S. DISTRICT COURT |
| | EASTERN DISTRICT OF CALIFORNIA |

UNITED STATES DISTRICT COURT

17 FOR THE EASTERN DISTRICT OF CALIFORNIA

18 [UNDER SEAL],                          2:10-CV-01273-KJM-EFB *SEALED*

19            Plaintiffs,

20                                        **FILED IN CAMERA AND UNDER SEAL;**
                                          **DO NOT ENTER IN CM/ECF**
      vs.
21
                                          THIRD AMENDED COMPLAINT FOR
22 [UNDER SEAL],                          VIOLATION OF FEDERAL FALSE
                                          CLAIMS ACT 31 U.S.C. § 3729 *et seq.*;
23            Defendants.                 FILED IN CAMERA AND UNDER SEAL
                                          (AS REQUIRED BY 31 U.S.C. § 3730(a)(2))
24

25

26

27

28

{00038736; 1}                   THIRD AMENDED COMPLAINT

1  CLAIRE M. SYLVIA (State Bar No. 138990)
   cms@pcsf.com
2  PHILLIPS & COHEN LLP
   131 Steuart Street, Suite 501
3  San Francisco, California  94105
   Tel: (415) 836-9000
4  Fax: (415) 836-9001

5  PETER CHATFIELD
   peter@phillipsandcohen.com
6  PHILLIPS & COHEN LLP
   2000 Massachusetts Avenue
7  Washington, DC  20036
   Tel: (202) 833-4567
8  Fax: (202) 833-1815

9  L. TIMOTHY TERRY, admitted *pro hac vice*
   tim@theterrylawfirm.com
10 THE TERRY LAW FIRM LTD.
   P.O. Box 2348
11 Carson City, NV  89702
   Tel: (775) 883-2348
12 Fax: (775) 883-2347

13 Attorneys for *Qui Tam* Plaintiff/Relator Max Bennett

14
                   UNITED STATES DISTRICT COURT
15
             FOR THE EASTERN DISTRICT OF CALIFORNIA
16

17 | UNITED STATES OF AMERICA; THE STATES | 2:10-CV-01273-KJM-EFB *SEALED*
   | OF CALIFORNIA, COLORADO,
18 | CONNECTICUT, DELAWARE, FLORIDA, | THIRD AMENDED COMPLAINT FOR
   | GEORGIA, HAWAII, ILLINOIS, INDIANA, | VIOLATION OF THE FEDERAL FALSE
19 | LOUISIANA, MARYLAND, | CLAIMS ACT [31 U.S.C. § 3729, *et seq.*];
   | MASSACHUSETTS, MICHIGAN, | CALIFORNIA FALSE CLAIMS ACT [Cal.
20 | MINNESOTA, MONTANA, NEVADA, NEW | Gov't Code §12650, *et seq.*]; COLORADO
   | HAMPSHIRE, NEW JERSEY, NEW MEXICO, | MEDICAID FALSE CLAIMS ACT [Colo.
21 | NEW YORK, NORTH CAROLINA, | Rev. Stat. § 25.5-4-303.5, *et seq.*];
   | OKLAHOMA, RHODE ISLAND, TENNESSEE, | CONNECTICUT FALSE CLAIMS ACT
22 | TEXAS, VIRGINIA, WISCONSIN, THE | [Conn. Gen. Stat. § 17b-301a, *et seq.*];
   | DISTRICT OF COLUMBIA, AND DOE STATES | DELAWARE FALSE CLAIMS AND
23 | 1-23, *ex rel.* MAX BENNETT, | REPORTING ACT [6 Del. C. § 1201, *et seq.*];
   |                                      | FLORIDA FALSE CLAIMS ACT [Fla. Stat.
24 |                 Plaintiffs,          | Ann. §68.081, *et seq.*]; GEORGIA
25 |                                      | MEDICAID CLAIMS ACT [Ga. Code Ann.
   |             vs.                      | §49-4-168, *et seq.*]; HAWAII FALSE
26 | BIOTRONIK, INC., WESTERN MEDICAL,   | CLAIMS ACT [Haw. Rev. Stat. § 661-21, *et
   | INC., CAESAR FONTE, PETER ELIA, ROBERT | *seq.*]; ILLINOIS WHISTLEBLOWER
27 | N. BERKLEY, LEON FELDMAN, W. JUDSON  | REWARD AND PROTECTION ACT [740 Ill.
   | FISHER, ARJUN V. GURURAJ, MONTY C.  | Comp. Stat. § 175/1-8]; INDIANA FALSE
28 | MORALES, WILLIAM H. RESH, ROBERT C. |

{00038736; 1}                THIRD AMENDED COMPLAINT
                                    1

1  WESLEY, AND NEVADA HEART AND
   VASCULAR CENTER, LLP,
2

3          Defendants.

CLAIMS AND WHISTLEBLOWER
PROTECTION ACT [Ind. Code Ann. § 5-11-
5.5-1, *et seq.*]; LOUISIANA MEDICAL
ASSISTANCE PRGRAM INTEGRITY LAW
[La. Rev. Stat. § 46:437.1, *et seq.*];

4  § 46.437.1, *et seq.*]; MARYLAND FALSE HEALTH CLAIMS ACT [Md. Code Ann., Health-
   Gen. § 2-601, *et seq.*]; THE MASSACHUSETTS FALSE CLAIMS LAW [Mass. Gen. Laws ch.
5  12 §5, *et seq.*]; MICHIGAN MEDICAID FALSE CLAIMS ACT [Mich. Comp. Laws § 400.601,
   *et seq.*]; MINNESOTA FALSE CLAIMS ACT [Minn. Stat. § 15C.01, *et seq.*]; MONTANA
6  FALSE CLAIMS ACT [Mont. Code Ann. § 17-8-401 *et seq.*]; NEVADA FALSE CLAIMS ACT
   [Nev. Rev. Stat. Ann. § 357.010, *et seq.*]; NEW HAMPSHIRE FALSE CLAIMS ACT [N.H. Rev.
7  Stat. Ann. § 167:61-b, *et seq.*]; NEW JERSEY FALSE CLAIMS ACT [N.J. Stat. § 2A:32C-1, *et
   seq.*]; NEW MEXICO MEDICAID FALSE CLAIMS ACT [N.M. Stat. Ann., § 27-14-1, *et seq.*];
8  NEW YORK FALSE CLAIMS ACT [N.Y. Stat. Fin. § 187, *et seq.*]; NORTH CAROLINA
   FALSE CLAIMS ACT [N.C. Gen. Stat. §1-605, *et seq.*]; OKLAHOMA MEDICAID FALSE
9  CLAIMS ACT [Okla. Stat. tit. 63 § 5053, *et seq.*]; RHODE ISLAND FALSE CLAIMS ACT [R.I.
   Gen. Laws § 9-1.1-1, *et seq.*]; TENNESSEE MEDICAID FALSE CLAIMS ACT [Tenn. Code
10 Ann. § 71-5-181, *et seq.*]; TEXAS MEDICAID FRAUD PREVENTION LAW [Tex. Hum. Res.
   Code Ann. § 36.001, *et seq.*]; VIRGINIA FRAUD AGAINST TAXPAYERS ACT [Va. Code
11 Ann. § 8.01-216.1, *et seq.*]; WISCONSIN FALSE CLAIMS FOR MEDICAL ASSISTANCE
   ACT [Wis. Stat. § 20.931]; and DISTRICT OF COLUMBIA PROCUREMENT REFORM
12 AMENDMENT ACT [D.C. Code § 2-308.13, *et. seq* ]

13                                          **FILED IN CAMERA AND UNDER SEAL**
                                            **JURY TRIAL DEMANDED**
14

15          Plaintiff/Relator Max Bennett, through his attorneys Phillips & Cohen LLP and The Terry

16  Law Firm, Ltd., on behalf of himself and the United States of America and the State of California,

17  the State of Colorado, the State of Connecticut, the State of Delaware, the State of Florida, the

18  State of Georgia, the State of Hawaii, the State of Illinois, the State of Indiana, the State of

19  Louisiana, the State of Maryland, the Commonwealth of Massachusetts, the State of Michigan, the

20  State of Minnesota, the State of Montana, the State of Nevada, the State of New Hampshire, the

21  State of New Jersey, the State of New Mexico, the State of New York, the State of North Carolina,

22  the State of Oklahoma, the State of Rhode Island, the State of Tennessee, the State of Texas, the

23  Commonwealth of Virginia, the State of Wisconsin, the District of Columbia, and any other State

24  that enacts a False Claims Act subsequent to the filing of this Complaint and in which Defendants

25  or either of them sell Biotronik, Inc.'s products (collectively "the States and the District of

26  Columbia"), for his Complaint against Defendant Biotronik, Inc., Defendant Western Medical,

27  Inc., Defendant Caesar Fonte, Defendant Peter Elia, Defendant Robert Berkley, Defendant Leon

28  Feldman, Defendant W. Judson Fisher, Defendant Arjun Gururaj, Defendant Monty Morales,

1   Defendant William Resh, Defendant Robert Wesley, and Defendant Nevada Heart and Vascular

2   Center, LLP (together "Defendants") alleges based upon personal knowledge and relevant

3   documents as follows:

4   **I.      INTRODUCTION**

5           1.      This is an action to recover damages and civil penalties on behalf of the United

6   States of America and the States and the District of Columbia arising from false and/or fraudulent

7   records, statements and claims made, used and caused to be made, used or presented by

8   Defendants Biotronik, Inc. and Western Medical, Inc., used or presented by Defendant Biotronik

9   and Defendant Western Medical and/or their agents, employees and co-conspirators, including the

10  Physician Defendants, in violation of the Federal Civil False Claims Act, 31 U.S.C. § 3729, *et eq.*

11  as amended ("the FCA" or "the Act") and its state law counterparts:  the California False Claims

12  Act, Cal. Gov't Code § 12650, *et seq.*; the Colorado Medicaid False Claims Act, Colo. Rev. Stat.

13  25.5-4-303.5, *et seq.*; the Connecticut False Claims Act, Conn. Gen. Stat. § 17b-301a, *et seq.*; the

14  Delaware False Claims and False Reporting Act, 6 Del. C. § 1201 *et seq.*; the Florida False Claims

15  Act, Fla. Stat. Ann. § 68.081 *et seq.*; the Georgia False Medicaid Claims Act, Ga. Code Ann § 49-

16  4-168, *et seq.*; the Hawaii False Claims Act, Haw. Rev. Stat. § 661-21, *et seq.*; the Illinois

17  Whistleblower Reward and Protection Act, 740 Ill. Comp. Stat. § 175/1-8; the Indiana False

18  Claims and Reporting Act, Ind. Code Ann. § 5-11-5.5-1, *et seq.*; the Louisiana Medical Assistance

19  Program Integrity Law, La. Rev. Stat. § 46:437.1, *et seq.*; the Maryland False Health Claims Act,

20  Md. Code Ann., Health-Gen. § 2-601, *et seq.*; the Massachusetts False Claims Law, Mass. Gen.

21  Laws ch. 12 § 5, *et seq.*; the Michigan Medicaid False Claims Act, Mich. Comp. Laws § 400.601,

22  *et seq.*; the Minnesota False Claims Act, Minn. Stat. § 15C.01, *et seq.*;  the Montana False Claims

23  Act, Mont. Code. Ann. § 17-8-401, *et seq.*; the Nevada False Claims Act, Nev. Rev. Stat. Ann.

24  § 357.010, *et seq.*; the New Hampshire False Claims Act, N.H. Rev. Stat. Ann. § 167:61-b, *et seq.*;

25  the New Jersey False Claims Act, N.J. Stat. § 2A:32C-1, *et seq.*; the New Mexico False Claims

26  Act, N.M. Stat. Ann., § 27-14-1, *et seq.*; the New York False Claims Act, N.Y. Stat. Fin. § 187, *et*

27  *seq.*; the North Carolina False Claims Act, N.C. Gen. Stat. § 1-605, *et seq.*; the Oklahoma

28  Medicaid False Claims Act, Okla. Stat. tit. 63 § 5053, *et seq.*; the Rhode Island False Claims Act,

1  R.I. Gen. Laws § 9-1.1-1, *et seq*.; the Tennessee Medicaid False Claims Act, Tenn. Code Ann.

2  § 71-5-181, *et seq*.; the Texas Medicaid Fraud Prevention Law, Tex. Hum. Res. Code Ann.

3  § 36.001, *et seq*.; the Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.1, *et seq*.;

4  the Wisconsin False Claims for Medical Assistance Act, Wis. Stat. § 20.931; the District of

5  Columbia Procurement Reform Amendment Act., D.C. Code § 2-308.13, *et seq*.; and the Acts of

6  "Doe" states that have not yet enacted False Claims Acts or whose acts are not effective at the

7  time of filing.

8        2.      This action involves Defendants' submission and causation of the submission of

9  false claims for payment to federal and state health care programs.  Since at least 2004, Defendant

10  Biotronik, Inc. ("Biotronik') has provided financial inducements to health care professionals for

11  the purpose of encouraging them to purchase Biotronik's medical devices, which were paid for

12  with federal and state funds and the claims for payment for those products and services constitute

13  false claims under federal and state law.  Since at least 2008, Defendant Western Medical, Inc.

14  ("Western Medical"), and its officers Defendants Caesar Fonte and Peter Elia, have partnered with

15  Biotronik in such endeavors.  Collectively, these four defendants are referred to as "the Biotronik

16  Defendants."  The Biotronik Defendants conspired with the Defendant physicians to submit false

17  claims.  The false claims Defendants submitted and caused to be submitted cheated the

18  governments out of funds that should not have been paid and unlawfully enriched Defendants.

19  **II.**     **PARTIES**

20        3.      Plaintiff/Relator Max Bennett ("Bennett" or "Relator") is a resident of

21  Sacramento, California, and was an employee of Defendant Biotronik.  Relator Bennett

22  commenced working for Biotronik in 2004 as a marketing manager.  In 2005, Biotronik promoted

23  the Relator to the position of Business Development Specialist, in which his job responsibilities

24  included developing business through a range of methods including promoting Biotronik's clinical

25  studies, educational events and dinners.  In 2008 Biotronik promoted the Relator to the position of

26  District Sales Manager for the State of Nevada.  In January 2010, Biotronik promoted the Relator

27  to Regional Sales Director for the Northwest Sales Region.  Immediately after the Relator reported

28  his concerns about Biotronik's kickback practices to his superiors in February 2010, however,

1  Biotronik placed him on paid administrative leave. Shortly thereafter Biotronik terminated his

2  employment.  The facts herein are based upon the Relator's personal observation and upon

3  documents and information in his possession.

4       4.      Defendant Biotronik, Inc. is an Oregon Corporation with its principal place of

5  business in Lake Oswego, Oregon.  Biotronik, Inc. is the United States arm of a global company,

6  Biotronik, which is based in Germany and which is principally engaged in the manufacture and

7  sale of implantable cardiovascular medical devices.  Biotronik's total revenues for the United

8  States operation in 2009 were approximately $250 million.

9       5.      Defendant Western Medical, Inc. is a Nevada Corporation that contracts with

10  Biotronik and other companies to sell products.  Western Medical works closely with Biotronik in

11  promoting sales of Biotronik products in California, Nevada, Arizona and Utah, through the

12  practices alleged in this complaint.

13       6.      Defendant Caesar Fonte is an individual residing in Las Vegas, Nevada.  He is the

14  President and CEO of Western Medical.  Fonte previously worked for Boston Scientific, a

15  competitor of Biotronik, before Biotronik entered into an agreement with Fonte in 2008.

16       7.      Defendant Peter Elia is an individual residing in California.  He is the Vice

17  President of Operations for Western Medical.  Elia previously worked for Boston Scientific, a

18  competitor of Biotronik, before Biotronik entered into an agreement with Elia in 2008.

19       8.      Defendant Dr. William H. Resh is an individual residing in Henderson, Nevada.

20  Dr. Resh is an electrophysiologist affiliated with, and managing partner of, Defendant Nevada

21  Heart and Vascular Center, LLP.

22       9.      Defendant Dr. Robert N. Berkley is an individual residing in Las Vegas, Nevada.

23  Dr. Berkley is an electrophysiologist affiliated with Defendant Nevada Heart and Vascular Center,

24  LLP.

25       10.      Defendant Dr. Robert C. Wesley is an individual residing in Las Vegas, Nevada.

26  Dr. Wesley is an electrophysiologist affiliated with Defendant Nevada Heart and Vascular Center,

27  LLP.

28

11.     Defendant Dr. Arjun V. Gururaj is an individual residing in Las Vegas, Nevada. Dr. Gururaj is an electrophysiologist affiliated with Defendant Nevada Heart and Vascular Center, LLP.

12.     Defendant Dr. Leon Feldman is an individual residing in Palm Desert, California. Dr. Feldman is the Chief of Cardiology at Eisenhower Medical Center in Rancho Mirage, California.

13.     Defendant Dr. W. Judson Fisher is an individual residing in Henderson, Nevada. Dr. Fisher is affiliated with Healthcare Partners of Nevada in Las Vegas, Nevada.

14.     Defendant Nevada Heart and Vascular Center, LLP is a group of cardiologists with its principal place of business in Las Vegas, Nevada.

15.     Defendant Dr. Monty C. Morales is an individual residing in Tuscon, Arizona.  Dr. Morales is a cardiologist affiliated with PIMA Heart in Tuscon, Arizona.

## III.     JURISDICTION AND VENUE

16.     Jurisdiction is based on 28 U.S.C. § 1331, 28 U.S.C. §1367 and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.  In addition, 31 U.S.C. § 3732(b) specifically confers jurisdiction on this Court over the state law claims asserted in this Complaint.  To the extent any public disclosure of any of the allegations or transactions has occurred, this Court would retain jurisdiction over this matter because Relator Bennett is the original source of the facts and information hereinafter set forth concerning the activities of the Defendants.

17.     This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a), because that section authorizes nationwide service of process and because Defendants have minimum contacts with the United States.  Moreover, one or more of the Defendants can be found in, reside, or transact or have transacted business in the Eastern District of California.

18.     Venue is proper in the Eastern District of California pursuant to 31 U.S.C. § 3732(a) because one or more of the Defendants can be found in and transact or have transacted business in this district.  At all times relevant to this Complaint, one or more Defendants regularly conducted substantial business within this district.

## IV.    **BACKGROUND**

19.    Defendant Biotronik sells a variety of cardiac rhythm management devices, including pacemakers and implantable cardiac defibrillators.

20.    Cardiac pacemakers are self-contained, battery-operated units that send electrical stimulation to the heart.  They are generally implanted to alleviate symptoms of decreased cardiac output related to abnormal heart beat and/or rhythm.  Pacemakers are covered under the Medicare program as prosthetic devices.  Medicare also covers a variety of services for the post-implant follow up and evaluation of implanted cardiac pacemakers.  Biotronik's pacemakers sell for approximately $5,000 per unit.

21.    Implantable Cardiac Defibrillators (ICDs) are electronic devices designed to detect and treat life-threatening arrhythmias.  The device consists of a pulse generator and electrodes for sensing and defibrillating.  ICDs are also covered under the Medicare program as prosthetic devices.  Biotronik's ICDs sell for approximately $20,000 per unit.

22.    Pacemakers and ICDs are prescribed by physicians and purchased by hospitals.  Typically, a cardiologist will refer a patient to an electrophysiologist ("EP") who specializes in implantable devices.  Either the cardiologist or the EP may recommend a particular type of implantable device.  The physician instructs the hospital on what brand and model of device he or she wants, and the hospital buys the device.  Because the industry considers these "physician preference" items, cardiologists and EPs are the target audience for a medical device company's sales team.

23.    Pacemakers and ICDs are typically implanted in an inpatient procedure.  Replacement devices are typically placed on an outpatient basis.  Each device typically must be monitored every three to six months.  Hospitals purchasing pacemakers and ICDs are reimbursed by Medicare through Diagnostic Related Group reimbursement codes (DRG), which pay a "set" amount of reimbursement to the hospital for the entire procedure.  Physicians are reimbursed separately for their professional services.  CPT codes are assigned to the different aspects of the physician services, including monitoring the device.

24.      Biotronik has a sales force that is divided by region of the United States.  There are currently three Vice Presidents of Sales, one for the Eastern portion of the United States, Hugh McCullough.  The Vice President for the Western portion of the United States was Bob Musmanno until sometime in 2010, when he was replaced.  As of 2010 there was a Vice President for the Central portion of the United States, Douglas McKinney.  Each Vice President of Sales oversees several regional sales directors.  Biotronik maintains a very small direct sales force.  Most of its sales force is comprised of independent sales representatives, such as Western Medical, which operates in Nevada, California, Arizona, and Utah.

25.      Defendant Biotronik promoted the Relator to District Sales Manager for Nevada in May 2008, at the time that Biotronik entered into an agreement with Defendant Caesar Fonte and Defendant Peter Elia, and their company, Defendant Western Medical, to be independent sales representatives for Biotronik.  Biotronik recruited Fonte and Elia away from Boston Scientific.  During the period of their one year non-compete agreements with Boston Scientific, Fonte and Elia worked with Biotronik nominally as sales representatives outside their old territories.   The Relator officially covered the Nevada territory on behalf of Biotronik that would later, after the expiration of the non-compete agreements, be officially covered by Western Medical on behalf of Biotronik (but was always covered by Western Medical on behalf of Biotronik in practice).  For example, while Fonte and Elia could not themselves conduct sales in Nevada, they advised and directed the Relator about what accounts to pursue in Las Vegas, which doctors should be offered consulting agreements, and all other marketing and sales opportunities directed at their former Boston Scientific customers.

26.      Biotronik paid Fonte a guarantee of $ 1.3 million and paid Elia $780,000, during the period that their non-compete agreements with Boston Scientific were in effect.  That amount far exceeded the market value for the services they were ostensibly going to provide – namely performing as sales representatives where they had not previously sold Boston Scientific products.  Fonte and Elia were in fact being paid a premium to convert their former Boston Scientific clients to Biotronik.  During this period Fonte and Elia set up and maintained an office in their former Boston Scientific territory (Las Vegas), paid for by Biotronik, and worked to convert their former

Boston Scientific customers to Biotronik by directing the Relator, Max Bennett, and other Biotronik employees, what to do.  They frequently attended Biotronik-funded dinners with their former Boston Scientific clients for the purpose of converting those clients to Biotronik and were paid substantial commissions on these sales.  Western Medical supervised and directed the employment of the Relator jointly with Biotronik.  In effect, the Relator reported immediately to his manager Fonte, who actively supervised and directed his employment day to day.  The Relator was also subject to management by then Biotronik Vice President Bob Musmanno and other senior management.  The purpose of this joint employment of the Relator was to help Western Medical and Biotronik get around both the letter and intent, or spirit, of Fonte and Elia's non-compete agreements with Boston Scientific.

27.     The Relator's position of District Sales Manager for Nevada was unique in several respects.  There were no other "district" sales manager positions.  The position had budget responsibility comparable to a regional sales director, but the Relator was paid $100,000 less for the position.  In addition, the Relator was directed by senior Biotronik management Tom Brown and Bob Musmanno to live in hotels in Las Vegas in order to hide some of the real cost of the project.  The Relator requested transfers out of Las Vegas in 2008 and 2009, but was not permitted to transfer until Fonte's and Elia's non-compete obligations had expired.

28.

29.     In the year that Fonte and Elia commenced working with Biotronik, sales of Biotronik products in Nevada jumped from no more than $20,000 to over $9 million, with many accounts switching from Boston Scientific to Biotronik.  These accounts were later officially assumed by Western Medical.

30.     As further described below, Biotronik, first alone and then also in conjunction with its independent sales representative Western Medical, offered a variety of financial inducements, in the form of sham consulting agreements, dinners, travel, and participation in clinical studies, to recommend and use Biotronik products, in an effort to achieve annual growth of between 20 and 30 percent.  The medical conditions leading to the implant of a pacemaker or ICD are primarily associated with an older population and about 80 percent of Biotronik's sales

{00038736; 1}                    THIRD AMENDED COMPLAINT
                                          9

1   can be traced to federally funded healthcare programs.  A national registry of all ICDs is

2   maintained as a condition for coverage for Medicare and therefore each device may be traced to its

3   manufacturer and purchaser.

4   **V.   APPLICABLE LAW**

5       **A.   The Federal False Claims Act**

6       31.   The Federal False Claims Act imposes liability on persons who knowingly submit

7   or cause to be submitted false or fraudulent claims for payment to the United States.  31 U.S.C. §

8   3729, *et seq.* ("FCA").  A claim for payment can be false if the Government would not have paid

9   the claim if it had known that the claim was submitted in violation of a law, such as the Anti

10  Kickback Statute.  The Complaint alleges that Defendants knowingly caused the submission of

11  false or fraudulent claims for payment to the United States Government for goods and services

12  that would not have been paid if the Government had known that the claims were tainted by

13  unlawful kickbacks paid to doctors and others to induce them to refer, recommend or arrange the

14  purchase of Biotronik's medical devices.

15      32.   The FCA provides that any person who causes to be presented false or fraudulent

16  claims for payment or approval to the United States Government, or knowingly causes to be made

17  or used false records and statements to induce the United States to pay or approve false and

18  fraudulent claims, is liable for a civil penalty of up to $11,000 for each such claim, plus three

19  times the amount of the damages sustained by the federal government.

20      33.   The FCA allows any person having information about false or fraudulent claims to

21  bring an action on behalf of the Government, and to share in any recovery.  The FCA requires that

22  the complaint be filed under seal for a minimum of 60 days (without service on the defendant

23  during that time) to enable the United States (a) to conduct its own investigation without the

24  defendant' knowledge, and (b) to determine whether to join the action.

25      34.   Many states have enacted False Claims Acts that are similar to the Federal False

26  Claims Act and that impose damages and penalties for the submission of false or fraudulent claims

27  to the state.

28

{00038736; 1}                   THIRD AMENDED COMPLAINT
                                          10

**B.** **Medical Device Reimbursement Under Medicare, Medicaid and Other Federal Health Care Programs**

**1.** **Medicare Parts A and B**

35.     Medicare is a federally-funded health insurance program primarily benefitting the elderly.  Medicare was created in 1965 when Title XVIII of the Social Security Act was adopted. Medicare, the nation's largest health insurance program, provides health insurance to people age 65 and over, those who have end-stage kidney failure, and certain people with disabilities.  42 U.S.C. §§ 426-426a, 1395o.

36.     The Department of Health and Human Services ("HHS") is responsible for the administration and supervision of the Medicare program.  The Centers for Medicare and Medicaid Services (CMS) is an agency of HHS that directly administers the Medicare program.

37.     The Medicare program has several parts, two of which are relevant here. Medicare Part A covers the cost of institutional care, including hospital inpatient stays, skilled nursing facility care and home health care.  42 U.S.C. §§ 1395c-1395i.  Medicare Part B (the Voluntary Supplemental Insurance Plan) covers the costs of physician services, certain pharmaceutical products, diagnostic tests and other medical services not covered by Part A.  42 U.S.C. § 1395k; 42 C.F.R. §§ 410.26; 414.701, 410.10.

38.     While CMS develops program policies and coordinates the overall administration of Medicare, most of the daily operations of the Medicare program in the various states are managed through contracts with private insurance companies that operate as Fiscal Intermediaries. Fiscal Intermediaries are responsible for accepting claims for reimbursements under Medicare Part A and making payments for such claims.  Most claims under Medicare Part B are administered by "Medicare Carriers."

39.     Under Medicare, different settings of care have different payment systems.  In the hospital setting where Medicare Part A is the payer, the payment amount is determined by DRGs. DRGs are a prospective payment system, meaning clinically similar diagnoses and/or procedure codes map to a DRG which then has a pre-determined reimbursement rate.

40.     A DRG's pre-determined reimbursement rate is paid to the hospital regardless of how long the patient is admitted or the number of services provided.

41.     In 2009, DRG Codes for ICDs were 222-27, 245 and 265 and payment ranged from $12,000 to $48,000.  In 2009, DRG Codes for pacemakers were 242-244, 258-62 and payment ranged from $5,500 to $20,000.

42.     Physician services provided while the patient is admitted to the hospital are billed and reimbursed separately from DRGs.  Physician services are reimbursed through a payment system called Resource-Based Relative Value Scale (RBRVS).  In the RBRVS system, payments for services are determined by the resource costs needed to provide them.  The cost of providing each service is divided into three components: physician work, practice expense, and professional liability insurance (malpractice).  Payments are calculated by multiplying the combined costs of a service by a conversion factor (a monetary amount that is determined by CMS).  Payments are also adjusted for geographical differences in resource costs.

43.     RBRVS payments are based on the Healthcare Common Procedure Coding System (HCPCS).  HCPCS is a standardized coding system designed to ensure that Medicare, Medicaid and other federal health care programs pay for services rendered to patients by attending physicians and other healthcare professionals in accordance with payment schedules tied to the level of professional effort required to render specific categories of medical care.  To ensure normalization of descriptions of medical care rendered and consistent compensation for similar work, both programs tie levels of reimbursement to standardized codes.

44.     On discharge of Medicare Part A beneficiaries from a hospital, the hospital submits claims for interim reimbursement for items and services delivered to those beneficiaries during their hospital stays.  42 C.F.R. §§ 413.1, 413.60, 413.64.  Hospitals submit patient-specific claims for interim payments on a Form CMS UB-92.

45.     As a prerequisite to payment from Medicare, CMS requires hospitals to submit annually a Form CMS-2552 (previously Form HCFA-2552), more commonly known as the Hospital Cost Report.  Cost Reports are the final claim that a provider submits to the fiscal intermediary for items and services rendered to Medicare beneficiaries.

46.     After the end of each hospital's fiscal year, the hospital files its Hospital Cost

Report with the fiscal intermediary, stating the amount of reimbursement the provider believes is

due for the year.  *See* 42 U.S.C. § 1395g(a); 42 C.F.R. § 413.20; *see also* 42 C.F.R.

§ 405.1801(b)(1).  Medicare relies on the Hospital Cost Report to determine whether the provider

is entitled to more reimbursement than already received through interim payments, or whether the

provider has been overpaid and must reimburse Medicare.  42 C.F.R. §§ 405.1803, 413.60, and

413.64(f)(1).

47.     Medicare Part A payments for inpatient hospital services are determined by the

claims submitted by the provider for particular patient discharges (specifically listed on UB-92s)

during the course of the fiscal year.  On the Hospital Cost Report, this Medicare liability for

inpatient services is then totaled with any other Medicare liabilities to the provider.  This total

determines Medicare's true liability for services rendered to Medicare beneficiaries during the

course of a fiscal year.  From this sum, the payments made to the provider during the year are

subtracted to determine the amount due the Medicare program or the amount due the provider.

48.     Medicare has the right to make retroactive adjustments to Hospital Cost Reports

previously submitted by a provider if any overpayments have been made.  42 C.F.R. § 413.64(f).

49.     Every Hospital Cost Report contains a "Certification" that must be signed by the

chief administrator of the provider or a responsible designee of the administrator. In September

1994, Medicare revised the certification provision of the Hospital

Cost Report to state:

> I further certify that I am familiar with the laws and regulations regarding the
> provision of health care services, and that the services identified in this cost report
> were provided in compliance with such laws and regulations.

Form HCFA-2552-92.

50.     In or about 1996, the Hospital Cost Report form was revised again to state:

> Misrepresentation or falsification of any information contained in this cost report
> may be punishable by criminal, civil and administrative action, fine, and/or
> imprisonment under federal law.  Furthermore, if services identified in this report
> were provided or procured through the payment directly or indirectly of a kickback

or where otherwise illegal, criminal, civil and administrative action, fines and/or imprisonment may result.

51.     Medicare Part B typically pays for outpatient services by paying 80% of the lesser amount of either a healthcare provider's normal charge for covered care or reasonable fee and service reimbursement rates calculated and published annually by CMS, based on location of the provider, using Current Procedural Terminology ("CPT") codes.  Similar to DRGs in the hospital setting, CPT codes seek to assign standard levels of reimbursement to standard medical procedures based on the effort and expense normally associated with efficient administration of such care.

52.     CPT code reimbursement can include a professional services component designed to compensate for services rendered by doctors or other qualified medical professionals (such as licensed nurse practitioners or physician assistants) and/or a technical component payment that is intended to reimburse costs associated with equipment and supplies needed to perform outpatient diagnostic or treatment procedures.  Physicians must also certify that the claims and the underlying transactions comply with Medicare laws, regulations and program instructions including the Federal anti-kickback statute.

**2.     Other Federal Programs**

53.     Medicaid is a public assistance program providing for payment of medical expenses for the poor and disabled.  Funding for Medicaid is shared between the federal government and state governments.  For dual-eligible patients (those eligible for both Medicaid and Medicare), Medicaid pays the deductible for Medicare patients.

54.     Although Medicaid is administered on a state-by-state basis, the state programs adhere to federal guidelines.  The federal Medicaid statute sets forth the minimum requirements for state Medicaid programs to qualify for federal funding, which is called federal financial participation.  42 U.S.C. § 1396, *et seq.*  Many States require the filing of Medicaid cost reports for hospitals.  Many of those rely on or supplement information provided by hospitals in their Medicare cost reports.

55.     In addition to Medicaid, the federal government reimburses the costs of healthcare services under several other federal health care programs, including CHAMPUS/TRICARE, CHAMPVA, and the Federal Employees Health Benefit Program.

56.     CHAMPUS/TRICARE, administered by the United States Department of Defense, is a health care program for individuals and dependants affiliated with the armed forces.  10 U.S.C. §§ 1071-1110.  CHAMPVA, administered by the United States Department of Veterans Affairs is a health care program for the families of veterans with 100 percent service-connected disability.

57.     The Federal Employee Health Benefit Program, administered by the United States Office of Personnel Management, provides health insurance for federal employees, retirees, and survivors.  5 U.S.C. § 8901, *et seq.*

58.     Although medical devices and the associated procedures are generally eligible for reimbursement under these federal health care programs, kickback induced claims are not eligible for program reimbursement.

**C.     The Anti-Kickback Statute**

59.     The federal health care Anti-Kickback statute, 42 U.S.C. § 1320a-7b(b), arose out of a Congressional concern that payoffs to those who influence health care decisions will result in goods and services being provided that are medically unnecessary, of poor quality, or even harmful to a vulnerable patient population.  To protect the integrity of federal health care programs form these difficult to detect harms, Congress enacted a prohibition against the payment of kickbacks in any form, regardless of whether the particular kickback actually gives rise to overutilization or poor quality of care.

60.     The Anti-Kickback statute prohibits any person or entity from making or accepting payment to induce or reward any person for referring, recommending or arranging for the purchase of any item for which payment may be made under a federally-funded health care program.  42 U.S.C. § 1320a-7b(b).  This statute prohibits a medical device company from offering to pay any remuneration, in cash or kind, directly or indirectly, to induce physicians or others to order or recommend items that may be paid for by a federal health care program.  The

law prohibits not only outright bribes and rebate schemes, but also prohibits any payment that has as one of its purposes inducement of a physician to recommend or use the company's products The Act also prohibits a physician from knowingly soliciting or accepting remuneration in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a federal health care program.

61.     Violation of the Anti-Kickback statute subjects the violator to exclusion from participation in federal health care programs, civil monetary penalties, and imprisonment of up to five years per violation.  42 U.S.C. §§ 1320a-7b(b)(2)(B); 1320a-7.  Any person convicted under the Anti-Kickback statute must be excluded (*i.e.*, not allowed to bill for services rendered) from federal health care programs for a term of at least five years.  42 U.S.C. § 1320a-7(a)(1).  Even without a conviction, if the Secretary of HHS finds administratively that a provider has violated the statute, the Secretary may exclude that provider from the federal health care programs for a discretionary period (in which event the Secretary must direct the relevant State agency(ies) to exclude that provider from the State health program), and may consider imposing administrative sanctions of $50,000 per kickback violation.  42 U.S.C. § 1320a-7(b).  A claim for payment that includes items or services resulting from a violation of the Anti-Kickback statute is a false or fraudulent claim within the meaning of the False Claims Act.  *See* 42 U.S.C. § 1320a-7b, as amended by the Patient Protection and Affordable Care Act, Pub. L. No. 111-148, § 6402(f) (2010).

62.     Compliance with the Anti-Kickback law is a precondition to participation as a health care provider under Medicare, Medicaid, CHAMPUS-TRICARE, CHAMPVA, Federal Health Benefit Program, and other federal health care programs.  Either pursuant to provider agreements, claims forms, or other appropriate manner, physicians who participate in a federal health care program generally must certify that they have complied with applicable federal rules and regulations including the Anti-Kickback law.

63.     Concern about marketing practices like those alleged in this Complaint prompted the Inspector General of the Department of Health and Human Services to issue compliance

1    guidance.  HHS OIG has advised that medical device companies should be guided by the

2    compliance guidance that the OIG published in 2003 for the pharmaceutical industry.  *See*

3    "Examining the Relationship Between the Medical Device Industry and Physicians," Testimony of

4    Gregory Demske, Assistant IG for Legal Affairs, OIG HHS, before the Senate Special Comm. On

5    Aging (Feb. 27, 2008).  The OIG Compliance Program Guidance for Pharmaceutical

6    Manufacturers, 68 Fed. Reg. 23731 (May 5, 2003) ("HHS OIG Guidance") identifies a number of

7    suspect marketing practices.

8        64.    Among the suspect practices the Inspector General identified were company

9    payments to physicians who had offered no particular services of benefit to the company but who

10   had generated in the past, or had the potential to generate in the future, a large volume of business

11   for the company.  The HHIS OIG Guidance cautions against the following suspect practices,

12   which are involved in this case:

13
         **a.   Improper consulting and advisory payments.**  These are payments made
14           pursuant to less than bona fide consulting or advisory arrangements, such as
             payments to physicians for simply attending meetings or conferences in a
15           passive capacity, or for services connected with a manufacturer's marketing
             activities, and payment for more than fair market value.
16
         **b.   Improper business courtesies and other gratuities**:  Gifts such as
17           merchandise of more than trivial value, entertainment, recreation, travel,
             meals, and other gratuities furnished in association with information or
18           marketing presentations.

19
         **c.   Improper educational funding**:  Funding for educational programs that is
20           driven by marketing purposes rather than bona fide educational purposes.

21

22       65.    In addition, the HHS OIG Guidance stresses that "under the anti-kickback statute,

23   neither a legitimate purpose for an arrangement (*e.g.*, physician education), nor a fair market value

24   payment, will necessarily protect remuneration if there is also an illegal purpose (*i.e.*, the

25   purposeful inducement of business)."  *Id.*

26       66.    The enactment of various provisions and amendments prohibiting kickbacks

27   demonstrates Congress's commitment to the fundamental principle that federal health care

28   programs will not tolerate the payment of kickbacks.  Thus compliance with the Anti-Kickback

1  statute is a prerequisite to a provider's right to receive or retain reimbursement payments from

2  federal health care programs.  Reimbursement is also prohibited by the general legal principle that

3  providers who are corrupt or unethical or violate the integrity of a government program involving

4  government funds are not entitled to payment from the public fisc for the resulting claims.

5      **D.    The Stark Statute**

6      67.    The Stark Statute, 42 U.S.C. § 1395nn, prohibits a physician from making

7  referrals for certain "designated health services" ("DHS") payable by Medicare to an entity with

8  which he or she (or an immediate family member) has a financial relationship, unless an exception

9  applies.  The statute also prohibits the entity from billing Medicare for those referred services.

10  The Center for Medicare and Medicaid ("CMS") has promulgated regulations interpreting the

11  statute.  A claim for payment that is based on a violation of the Stark Statute constitutes a false

12  claim under the FCA.

13  **VI.    DEFENDANTS' UNLAWFUL PRACTICES**

14      68.    The Biotronik Defendants provided physicians and others illegal financial

15  inducements to refer, recommend or arrange for the purchase of Biotronik's products in violation

16  of the Anti-Kickback Statute.  As further described below, the Biotronik Defendants employed a

17  variety of methods of offering and transferring value to physicians and others to induce the

18  purchase of Biotronik products.  A single targeted physician could be compensated in multiple

19  ways.  Biotronik also compensated independent sales representatives to induce sales, by providing

20  guarantees and commissions far in excess of the market rate, in addition to providing staffing and

21  financial resources.  For example, Biotronik provided to Western Medical the use of its

22  employees, including the Relator, and conferred significant financial resources for lavish meals,

23  sham consulting agreements, and clinical studies, among other improperly motivated activities

24  discussed below, subject to the primary direction and control of Western Medical for the purpose

25  of converting referring physicians' loyalty from Boston Scientific to Biotronik.  The same conduct

26  that violates the Anti-Kickback statute may also violate the Stark statute.  Rather than compete on

27  price the Biotronik Defendants elected to provide physicians and others financial inducements to

28  refer, recommend or arrange for the purchase of its products.  That conduct inflates the cost of

1   providing healthcare to persons in need of pacemakers and ICDs, and maintains the price for such

2   procedures at an artificially high level, costing the Government substantially more than it would

3   have paid in the absence of kickbacks.

4        69.     Defendants, Berkley, Feldman, Fisher, Gururaj, Morales, Resh, Wesley and

5   Nevada Heart and Vascular Center, LLP (the "Physician Defendants") knowingly solicited or

6   accepted remuneration from the Biotronik Defendants in return for referring individuals to persons

7   for the furnishing or arranging for the furnishing of items or services for which payment may be

8   made in whole or in part under a federal or state health care program; or for the purpose of being

9   influenced in the purchase of, or arrangement for or recommendation of the purchase of, Biotronik

10  products paid for under a federal or state health care program.  These Physician Defendants

11  solicited or accepted a variety of financial inducements, including but not limited to payment for

12  consulting arrangements that involved no work, lavish dinners and entertainment, and other

13  remuneration that they knew were being provided for the purpose of inducing them to refer,

14  purchase, recommend or arrange for the purchase of Biotronik products, which they did.  In some

15  cases, the doctors switched entirely from using the products of other companies to exclusively

16  using Biotronik products following the payment of substantial inducements by the Biotronik

17  Defendants.

18       70.     Biotronik executives were fully aware of the company's wrongdoing.  On

19  February 12, 2010 the Relator reported to the President of Biotronik and other management a

20  number of violations of law.  The Relator reported several types of kickback schemes and other

21  violations of law.  For example, he reported that under the joint supervision of Western Medical

22  and Biotronik, employee Carl Giorgi purchased a receipt maker to break up dinner expenses and

23  create fraudulent business records, which in fact would violate Oregon, Nevada, and federal law.

24  The Relator reported that he had earlier complained about Giorgi's use of the receipt maker to

25  Fonte, Elia and Rimmer and was told to be quiet to keep his job.

26       71.     The Relator further reported on February 12, 2010 that he was instructed to falsify

27  business records as to physician consulting hours with Western Medical in violation of Oregon

28

1   and federal law by his Western Medical and Biotronik bosses Fonte, Elia, Rimmer, and

2   Musmanno.

3       72.     On February 14, 2010, the Relator also reported the problem with Biotronik's

4   business model of trying to grow Biotronik at 30% a year when the market itself is growing at

5   about 5% a year by overpaying the independent sales representatives like Western Medical

6   acquired from the competition and putting extreme pressure on the sales force to then deliver to

7   Biotronik the competition's customers.  Although Biotronik pretended that its relationship with

8   Western Medical was arms length, it was not.  The Relator pointed out that Western Medical was

9   not supposed to operate in Las Vegas, yet compliance never once visited Las Vegas in the twelve

10  months the Relator worked there on the behalf of Western Medical and Biotronik.

11      73.     On February 14, 2010, when informed by Biotronik President, Jake Langer, that

12  Western Medical and Biotronik employee Carl Giorgi was fired by Biotronik, the Relator reported

13  to Langer that Caesar Fonte knew about Giorgi's fraudulent activity and compensated Giorgi on

14  the side.  The Relator also reported that Biotronik employees working jointly for Western

15  Medical, including the Relator, received compensation from Western Medical in 2008 as bonuses.

16  On information and belief, Biotronik took no action against Fonte, Elia or Western Medical in

17  response to the allegation of Fonte's knowledge and implied direction of Giorgi's fraudulent

18  conduct.  Moreover, Biotronik is aware that Giorgi has since been rehired, this time *officially* by

19  Western Medical.

20      74.     On February 15, 2010, the Relator inquired of Biotronik, including Langer, what

21  to do about his concerns that AdvaMed Guidelines, California, Nevada, and federal law had been

22  violated.  Biotronik told the Relator only that the purpose of their internal investigation was so that

23  they could self-report any issues to the Department of Justice.  In fact, Biotronik did not want it

24  reported, and never did report it.  Biotronik did not want the wrongdoing of Western Medical

25  reported and its joint employer relationship with Western Medical exposed.  Western Medical

26  delivered a lot of new customers and sales to Biotronik.

27      75.     The Defendants' unlawful practices of offering financial inducements to

28  physicians to refer, recommend or arrange for the purchase of Biotronik's products, and Defendant

1 Biotronik's offering of inducements to nonphysicians for the same purpose and selling defective

2 products.

3

4  **A.   Financial Inducements to Physicians to refer, recommend, or arrange for the
     purchase of Biotronik products**

5      **1.   Sham Consulting Agreements**

6      76.   One of the methods the Biotronik Defendants used to induce sales was to

7 offer sham consulting agreements to physicians who were the source of, or were likely to

8 be the source of, significant sales of Biotronik products.

9      77.   Biotronik and Western Medical offered two types of agreements for

10 physicians to serve on an "expert panel."  The agreements were prepared by Biotronik,

11 based on agreements Fonte had used at Boston Scientific, and were used both by

12 Biotronik sales representatives and by Western Medical in selling Biotronik products.

13 Biotronik and Western Medical consulted regarding what doctors should be put on the

14 expert panels.  For example, Western Medical directed that consulting agreements be

15 provided to four doctors affiliated with Defendant Nevada Heart and Vascular Center,

16 LLP  -- Defendants Dr. Robert Berkley, Dr. Arjun Gururaj, Dr. Robert Wesley, and Dr.

17 William Resh -- who were also Fonte's former Boston Scientific customers.

18      78.   One type of consulting agreement provided for advisors to be paid a

19 ▮▮▮▮▮ monthly retainer for their purported services and the other type of agreement

20 provided for senior advisors to be paid a ▮▮▮▮ monthly retainer for their purported

21 services.  The agreement for a senior advisor offered a physician ▮▮▮ per month

22 retainer, purportedly to provide "as needed" consulting services.  Biotronik paid the

23 advisor regardless of the amount of services actually provided and whether or not any

24 services were actually provided.  The agreement states that the services purportedly to be

25 provided include:

26      ● as needed input for Biotronik marketing personnel regarding ▮▮▮▮▮

27 ▮▮▮▮▮ ;

28

• as needed advice on the market for ██████████, including information about ██████████;

• meeting with sales and marketing management to discuss ██████████, ██████████████████████████;

• one day a month training for sales representatives;

• as needed assistance in developing █████████████████████; ██████;

• meet with ████████████████ on a monthly basis to provide direction and ideas on how to improve ██████████████ and to guide and direct ██████ ████████.

79.     The consulting agreement for regular advisory panel members provided a █████ per month retainer for a minimum of eight hours of consulting, and an additional █████ per day plus meals, hotel and airfare for attendance at expert panel meetings with ████████████████████. The services purportedly provided by these advisory panel members included among other things:

• Discussion of ██████████████ to help Biotronik maximize its acceptance in the marketplace

• Discussion of ████████████████ that may effectively promote the utilization of Biotronik ████████████.

80.     The doctors who serve on these panels are nominated by Biotronik's sales force, including independent sales representatives such as Western Medical, in order to ensure that the opportunities would be offered to doctors who were targets for future sales.  Biotronik did not impose credential-based qualifications for the persons serving on these expert panels.  Among the physicians nominated for these panels by sales representatives and who served on the panels included the following California-based physicians:  Prash Jayaraj (Los Angeles), Mike Brodsky (Irvine), Siva Arunasalem, (Victorville), Mike Vargas (Murieta), Amir Hedayeti (Los Angeles), Leo Polosajian (Encino), Duane Bridges (Ingelwood).

81.     Defendants Fonte and Elia ensured that Defendants Dr. Robert Berkley, Dr. Arjun Gururaj, Dr. Robert Wesley, Dr. William Resh, Dr. Monty Morales, and Dr. Leon Feldman were provided agreements for consulting services.  These Defendant Physicians knew that no actual work was expected in return for Biotronik's payment of between $2,500 and $5,000 a month and that the purpose of the payment was to induce them to recommend or use Biotronik products.  Defendant Caesar Fonte typically hand delivered the checks to the Physician Defendants affiliated with Nevada Heart and Vascular Center at dinners paid for by Biotronik.

82.     The Biotronik Defendants did not monitor what activities, if any, were performed by the expert panel consultants.  In fact, little or no work typically was performed.  Biotronik management directed regional sales managers to be responsible for ensuring the consultants' reports were sent to the company.  Members of the sales team, including the Relator, filled out the time sheets and fabricated the hours and tasks.  The Defendants Drs. Berkley, Gururaj, Wesley, Resh, Morales and Feldman were aware that they were in fact not performing any services in exchange for the payments they received as consultants.  When the Relator brought Defendant Dr. Gururaj his expert panel consulting agreement in 2008, Defendant Dr. Guruarj asked only whether the other doctors were getting paid the same amount of money to be on the expert panel.

83.     The Biotronik Defendants had physicians who were members of the expert panel engage in what they called "double dipping," or receiving additional payments for other arrangements with Biotronik, such as the training and speaking fees discussed below.  Defendants paid the same physicians for training, for speaking, for participation in clinical studies, and provided them lavish meals totaling thousands of dollars, as further described below.  Doctors provided these benefits were targeted because they produced, or were likely to produce, high levels of sales of Biotronik devices.

84.     The Defendant Physicians knowingly solicited or accepted these multiple opportunities for remuneration in exchange for business.  For example in a meeting with

1   the Relator, Defendant Peter Elia, and Cathy Urratio, a Biotronik business development

2   representative, at a Denny's diner in Palm Springs, California, Defendant Dr. Feldman

3   provided a detailed list of interests in compensated opportunities that Biotronik could

4   provide him, including consulting, sales representative training, physician training,

5   speaking engagements, clinical studies, travel, and participation in speaking on EP

6   Fellows educational panels.  Following this meeting, Cathy Urratio commented to the

7   Relator that Dr. Feldman had the most comprehensive list of demands of any physician

8   the two had ever worked with.  Defendant Dr. Morales also met with the Relator and

9   Biotronik representative Anthony Kumar, as well as Defendants Fonte and Elia and

10  expressed his interest in clinical studies, dinners with referring physicians and expert

11  panels.

12         85.     The Biotronik Defendants provided other kinds of consulting agreements

13  as well.  For example, Western Medical, Casear Fonte and Peter Elia, through Western

14  Medical's related entity, Western Diagnostics, retained as a medical consultant Defendant

15  Dr. W. Judson Fisher, formerly a physician with Rainbow Medical in Las Vegas, Nevada

16  (which was acquired by Healthcare Partners in 2010), who referred patients to Defendant

17  Nevada Heart and Vascular Center, LLP, one of Western Medical's biggest customers.

18  Fisher was selected and paid $75,000, not because of his special expertise, but because he

19  would switch his business to Biotronik from a competitor, St. Jude Medical, which he in

20  fact did.  Other types of consulting arrangements, including paying fellows to serve on an

21  advisory council, are discussed below.

22              **2.     Training**

23         86.     The Biotronik Defendants also paid physicians to "train" sales representatives and

24  other physicians in the use of Biotronik products.  The training was of little genuine value to the

25  Biotronik Defendants as training, but rather was driven by sales and marketing needs.

26         87.     For the training of sales representatives, the training arrangement paid ▮▮▮  for

27  each training session.  As in the case of the expert panels, the Biotronik sales force, including

28  Biotronik's direct sales force and its independent sales representative, Western Medical, selected

the doctors to provide the training.  Such training was solicited primarily as a means for sales personnel to gain access to those doctors in order to encourage purchases of Biotronik's products.  The selection of training sites was driven by sales potential, rather than by the expertise of the physician trainers or the need for training in a particular geographic area.  Of the 65 training sites Biotronik has, 40 were located in Biotronik's Western sales region, not because of any training-centered reasons, but to facilitate aggressive use of this opportunity by Western Medical as an inducement to doctors to switch their business to Biotronik.  Whether or not the physician actually received substantial sums for training, the opportunity to do so was used by Biotronik's sales force, including Western Medical, as a value-added proposition to offer physicians to persuade them to use Biotronik products.  Defendants also paid doctors for training sessions that were not provided.

88.     Similarly, the Biotronik Defendants arranged for the training of physicians in the use of Biotronik products.  For example, Western Medical arranged for Defendant Dr. Gururaj, who was also a paid consultant, speaker, and who was provided very large amounts of expenses in the forms of meals, to provide training to other physicians.  He was paid ███████ for a two-day "skills course" held in Las Vegas in 2009.  The program was specifically promoted to potential future customers.

**3.     Speaking Agreements**

89.     For the same marketing purposes, the Biotronik Defendants also pay physicians for speaking engagements, often the same physicians who receive other compensation from the Biotronik Defendants, such as consulting agreements and training agreements.  The speaking agreements do not specify the amount of the payment.  Payments ranged between $1,500 and $2,500, and are somewhat more for Key Opinion Leaders ("KOL").  Speakers were selected by the Biotronik marketing and sales force, including its independent sales representative Western Medical.  Among the doctors Biotronik paid to be speakers were:  Dr. Ishu Rao, Dr. Tom Mattioni, and Dr. Wilbur Su.  As with the expert panels, the Biotronik sales team nominated the speakers, and Biotronik imposed no credential-based qualifications for speaking contracts. Defendant Dr. Gururaj requested that the Relator arrange speaking events for him, including a DTT meeting in Las Vegas in 2008.  He also sought and accepted other paid speaking opportunities in Las Vegas, Miami and New York.  Defendant Dr. Feldman was paid by Biotronik to speak at many meetings and events.

### 4.     Meals and Entertainment

90.     To advance their marketing objectives further, the Biotronik Defendants paid substantial amounts for meals for targeted doctors, including the same doctors who received other compensation from Biotronik.  The Physician Defendants knowingly solicited or received meals and entertainment paid for by the Biotronik Defendants in return for referring, purchasing, or arranging or recommending for the purchase of Biotronik products.

91.     In the Western sales region, during 2008, Biotronik paid for dinners for targeted physicians in the thousands of dollars.  In the case of Defendant Gururaj, who also had a Biotronik consulting agreement to serve on an expert panel, was a Biotronik paid speaker, and had training agreements with Biotronik, Biotronik paid for over $10,000 in meals in one year.  Defendant Dr. Gururaj called Caesar Fonte, Carl Giorgi, or the Relator on an almost weekly basis to request to go out to dinner at such places as the Mandalay Bay hotel in Las Vegas, where Biotronik would pay for dinner and after dinner drinks.  Other top revenue generating doctors who were provided meals worth over $5,000 in a single year were Dr. Laybon Jones, Dr. Cyrus Mancherji, Dr. Gurinder Dhillon, and Defendant Dr. Wesley.  After an internal Biotronik audit triggered by inquiries from

the Relator, the company discussed the Relator's suggestion of capping the amount that could be spent on dinners. Bob Musmanno, then Western Vice President for Sales, complained that such a cap would undermine sales efforts and Biotronik took no effective action. Sales representatives continued to spend excessive amounts on physician dinners, sometimes falsifying expense reports to indicate that more people were present than were actually present at a dinner so that the cost per physician appeared smaller than it actually was.

92.     In Nevada, where Biotronik and Western Medical do substantial business, the State requires medical device companies to adopt a marketing code of conduct and submit it to the Nevada Board of Pharmacy each year. Companies may adopt, without modification, the code of ethics promulgated by AdvaMed, an industry sponsored organization, or adopt their own that covers certain topics. *See* Nevada Marketing Code of Conduct, Nev. Rev. Stat. § 639.570. AdvaMed caps dinners for physicians at $150. Biotronik's own code of conduct allows only for "modest" meals as an "occasional business courtesy," incident to the scientific, educational, or business discussions, with a maximum acceptable cost of $150 a person, subject to an adjustment based on regional costs. Biotronik's dinners, and the dinners provided by Western Medical to sell Biotronik devices, well exceeded both AdvaMed standards and Biotronik's own purported standards.

### 5.     Educational Programs

93.     The Biotronik Defendants also used purported educational opportunities for physicians in order to influence sales. For example, Biotronik holds educational meetings to which it invites targeted physicians and provides transportation, lodging, and meals. This practice was summarized in an internal "implementation guide" forwarded to the company's sales force along with an agenda for the educational meeting on device technology and therapy at the Westin Hotel in San Francisco, California in March 2010. The "Implementation Guide" instructs sales representatives to try to achieve 50% attendance by "targeted EPs" (electrophysiologists). The guide explains that the goal is to turn the educational meetings into "coveted and memorable experiences for our targeted EP customers" and proposes allowing targeted EP customers to invite their "referring cardiologists" too. The memo explains that targeted EPs "are defined by

marketing segmentation and validated between" the sales representative and their regional sales director.  Although there may be some educational content, the purpose of the meeting is largely sales driven.  The meetings are followed by lunch with a sales representative and lavish dinners at expensive restaurants in the destination cities where they are held (*e.g.,* Miami, Las Vegas, New York City and San Francisco).  Biotronik's Executive Vice President Tom Brown advised Biotronik's sales team to "mine" the list of persons who attended these events to increase sales.

94.     The Biotronik Defendants also use the funding of a "fellows" program to influence sales.  In a powerpoint presentation analyzing the return on investment (ROI) for the company's expenditures on fellows, or young physicians just completing their training, Pat Newton, Biotronik's Vice President of the International Fellows Program, explained that a single EP, implanting 3 ICDs a month will generate $1 million in annual revenue.  The presentation proposes aligning 22 Biotronik regional sales directors or "champions" with a single "EP Fellow Rainmaker."  The overall strategy is described as "identifying, cultivating and developing the individual fellows most likely to impact future growth."

95.     As Bob Musmanno, Biotronik's then Vice President of Sales for its Western sales region, succinctly stated in an e-mail to district sales managers on September 4, 2009:  "If there are any of you who do not believe that this program is all of our futures and the only way we will sustain growth, organic growth, over the next 5-10-15 years, you should tender your resignations now as you will not be able to bear the heat that I plan to place on each of you and the MDR's and the Champions over these next months and years."  Musmanno's business plans for Biotronik's Western region stressed identifying fellows at institutions that Biotronik sells to and targeting those fellows to invite to educational programs.  Biotronik uses a variety of methods to induce future sales through fellows, including paying for trips to "fellow meetings," paying recent graduates to serve on a "fellows advisory council" purportedly to advise current fellows, and providing grants to the educational institutions where the fellows are studying to underwrite the fellow programs.

**6.     Clinical Studies**

96.     A cornerstone of Defendant Biotronik's marketing plan promoted and carried out

by Western Medical is to drive sales through the use of clinical studies of its devices.  Clinical studies evaluate the performance of a product.  The FDA sometimes requires such studies, and the studies also may be initiated by Biotronik, as for example the Galaxy study.  Biotronik pays a physician for each patient the physician enrolls in a study.  For the physician, that is income on top of the income he or she receives for doing the procedure.  For example, for the Celestial and Galaxy clinical studies, each of which enroll up to 2,000 patients, doctors are paid ███ per enrollment and an additional ███ for follow up visits every 3 to 6 months, with a maximum payment of ███.  Biotronik has a number of other studies, including Trust, Impact, EchoCRT, Replace, Clear and Cosmo.

97.     Biotronik's use of clinical studies is driven by its sales force's needs rather than by clinical or research purposes.  Biotronik sales representatives are directed to target physicians to enroll patients in the studies.  The company distributes to its sales force monthly reports explaining the enrollments in clinical studies by sales region.  Biotronik sales meetings acknowledge that some physicians will not use Biotronik devices unless they can enroll their patients in these clinical studies, and Biotronik refers to this category of physicians as "pay to play."  Biotronik refers to physicians who sign on to do the studies, but then do not enroll significant numbers of patients as "losers."

98.     Biotronik's Western Vice President of Sales, Bob Musmanno, circulated a sales plan for his area that emphasized the need to continue to "drive sales through our scientific studies."  When these opportunities were insufficient to generate enough sales, Musmanno asked the sales force to come up with more clinical studies to offer doctors.

99.     Defendant Nevada Heart and Vascular Center, LLP enrolled patients in a very high level of Biotronik clinical studies to enhance earnings of its doctors, including Defendants Drs. Resh, Berkley, Wesley and Gururaj.

**7.     Sales Representatives Performing Device Monitoring Tasks for Physicians**

100.     Pacemakers and ICDs must be monitored periodically by physicians to ensure that

1  the device is performing properly.  CPT codes are assigned to the various monitoring procedures.

2  Biotronik sales representatives sometimes perform these services in lieu of the supervising

3  physician and without physician supervision, and the physician's office then bills for the

4  procedure.  By performing these services, Biotronik sales personnel are providing yet another

5  form of compensation to the physicians.  Moreover, the services being billed are not properly

6  reimbursable, because they are not actually performed by the billing physician or by any other

7  medical professional whose services are properly billed under the professional component of

8  federal health care reimbursement.  Biotronik Field Trainers, Louise Petrarca and Kate Lay,

9  supervised new hires and showed them how to perform this function.

10            **8.      Investment in Distributorship**

11        101.    In at least one instance, Kirk Marshall, a sales representative for Biotronik, offered

12  a doctor an investment interest in a distributor of Biotronik products in the Philippines.  That

13  doctor, Jerome Robinson, was also the source of significant sales of Biotronik products and

14  inducing such sales was the purpose of offering him the investment in the distributorship.

15  Biotronik's President was aware of and approved this relationship.

16        102.    In sum, through a variety of methods, the Biotronik Defendants provide

17  compensation to targeted physicians, including but not limited to the Physician Defendants, for the

18  purpose of inducing the physicians to recommend and hospitals to purchase Biotronik products, all

19  in violation of federal and state laws prohibiting this.  The Physician Defendants knowingly

20  solicited or accepted these payments from the Biotronik Defendants in exchange for referring,

21  purchasing, or arranging or recommending the purchase of Biotronik products, all in violation of

22  federal and state laws prohibiting this.

23        **B.      Financial inducements to others to refer, recommend, or arrange for the
24                 purchase of Biotronik products**

25        103.    In addition to the inducements provided to physicians, Biotronik paid unlawful

26  inducements to independent sales representatives to refer, recommend, or arrange the purchase of

27  Biotronik products.  As part of its plan to grow at an extraordinary rate of 30% a year, Biotronik

28  actively recruited sales representatives away from its competitors by offering them arrangements

well above market rate for the services provided.  Biotronik entered into agreements with these recruits as independent sales representatives, rather than direct employees, offered them commissions of between 30% and 50%, and in some cases offered them extremely high salary guarantees during their noncompete periods.  For example, Biotronik paid Chris Baer, a former Guidant sales representative a guaranteed compensation of $600,000 for his first year with the company.  Biotronik also provided the independent sales representatives with employees, such as the Relator, to work under the direction and control of the independent representatives yet remain on Biotronik's payroll and under its joint supervision.  The value of these independent sales representatives, as reflected in their salary guarantees during periods when they were purportedly not working, was their ability to convert their former customers to Biotronik.

104.     For example, Defendant Caesar Fonte set up and maintained an office, leased and paid for by Biotronik, in Las Vegas, his and Defendant Peter Elia's former Boston Scientific territory, during the year of their non-compete with Boston Scientific.  During this period, Biotronik paid Fonte a guarantee of $1.3 million, and an additional $780,000 to Elia, notwithstanding that their noncompete agreements with Boston Scientific prohibited them from selling in the Las Vegas territory and Fonte did little or no work in the California territories to which he was ostensibly assigned.  Fonte and Elia nevertheless directed others, including the Relator, to contact Fonte's former clients in Las Vegas, advised on how to approach those customers, regularly attended dinners with these former customers, and advised Biotronik on setting up consulting agreements with these former customers.  These efforts paid off and Biotronik's business in Las Vegas that year went from approximately $20,000, representing a few implants a year, to over nine million.

105.     On information and belief, Biotronik's contract with Fonte included a 90 day clause during which Fonte could walk away from his contract with Biotronik for any reason.  Musmanno instructed the Relator to do anything and everything to keep Fonte happy or else the Relator would lose his job.  This included the Relator taking orders and following instructions from Fonte daily and from Elia whenever applicable.  In Las Vegas, at all times, the Relator reported to Fonte, and when Elia was there, the Relator reported to Elia as well.  Biotronik

1  pressured the Relator to do what Fonte and Elia told the Relator to do under the threat of losing his

2  job.

3      106.    While working for Boston Scientific Corporation, and its wholly owned

4  subsidiary, Guidant Sales Corporation, Peter Elia held the position of Area Vice President.  As

5  Area Vice President, Elia's region included Southern California; Bullhead City, Arizona; Las

6  Vegas, Nevada; and Hawaii.  Immediately upon leaving his position as Area Vice President for

7  Guidant Sales Corporation to work on behalf of Biotronik and Western Medical, and during the

8  period of Elia's non compete, Elia held the position of "sales representative."  In fact, however,

9  Elia supervised and directed employees of Biotronik and Western Medical over the territories in

10  which he was contractually obligated not to compete: Southern California, Las Vegas, Nevada,

11  and Bullhead City, Arizona.  In fact, Elia, working on the behalf of Biotronik and Western

12  Medical, never performed any of the job functions of a sales representative.  Instead, Elia

13  consistently exercised the role of supervisor and manager over Biotronik and Western Medical

14  staff, including the Relator.

15      107.    The purpose of these arrangements and extraordinary payments was to induce the

16  referral, recommendation, or arrangement of the purchase of Biotronik products.  In addition, by

17  entering into agreements with independent sales representatives, rather than hiring sales

18  representatives as direct employees, Biotronik could both fund and encourage the unlawful

19  inducements these independent sales representatives paid to physicians and others, while

20  attempting to deny control over the representatives that sold its products.  In contrast to its

21  publicly held competitors, Biotronik, a private company, has a very small direct sales force and

22  relies predominantly on funding independent sales representatives and providing them with

23  money, staff and opportunity to convert their former customers and attract new ones.

24      108.    The Biotronik Defendants induced the purchase of Biotronik products in other

25  ways.  For example, in 2008, they sought to obtain a contract with the University Medical Center

26  ("UMC") by offering lucrative jobs to employees of its competitors in return for information about

27  competitor's prices, in order to undercut the competition in a sealed bid process.  Mike Nitsch,

28  who represented St. Jude Medical in the UMC bidding process, and Mike Iverson, who

1  represented Boston Scientific in the process, were employed by Biotronik within six months of the

2  award of the UMC contract to Biotronik.  Biotronik also provided UMC $6,000 in the form of a

3  grant for advertising during the period that the contract was being awarded.  Kathy Silver, the

4  Chief Executive Officer of UMC, solicited the grant through Defendant Dr. William Resh, a

5  consultant for Biotronik and Western Medical, who asked Defendant Caesar Fonte to fund the

6  advertisement.  Fonte requested Biotronik to fund the advertisement, which it did.

7  **C.    Sales of Defective Products**

8  109.    In addition to the foregoing unlawful practices, Biotronik violated the False

9  Claims Act by knowingly causing the submission of false claims for payment for defective

10  products.  Biotronik marketed the Xelos, Kronos, and Tupos ICD's, knowing that the transformers

11  in Xelos and Kronos were faulty and that the battery in the Tupos had a much shorter life than was

12  represented.  Biotronik was aware of these defects because it had used the same transformer,

13  capacitor and battery technologies in an earlier generation of devices (Belos and Tachos) that had

14  to be recalled because of the defects in these component parts.  Although Biotronik ultimately

15  reported the problems with Kronos and Tupos upon information and belief, Biotronik did not

16  inform the Government that it had been aware of the problem when it sold devices prior to

17  notifying the Government, did not reimburse the Government for the defective items, and charged

18  to replace items that it knew were defective.  These actions also caused patient harm, including but

19  not limited to the additional procedures to replace the defective devices.

20  **LEGAL CLAIMS**

21  110.    Relator alleges that Defendants' conduct detailed above violates the Federal False

22  Claims Act, 31 U.S.C. § 3729, *et seq.* (1986), and as amended (Count I and II) and the False

23  Claims Acts of the State plaintiffs (Counts III through XXXI).

24  **CLAIMS ON BEHALF OF THE UNITED STATES**

25  **Count I**

26
27  **False Claims Act 31 U.S.C. §§ 3729(a)(1) and (a)(2) (1986) and as amended by the Fraud
   Enforcement and Recovery Act, Pub. L. No. 111-21 (2009)
   (All Defendants)**

28  111.    Relator repeats and realleges each and every allegation contained in paragraphs 1

{00038736; 1}                    THIRD AMENDED COMPLAINT

through 110 above as though fully set forth herein.

112.     This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729, *et seq.,* as amended.

113.     By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to officers, employees or agents of the United States Government for payment or approval within the meaning of 31 U.S.C. § 3729(a)(1) (1986) and 31 U.S.C. § 3729(a)(1)(A) (2009).

114.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false or fraudulent records and statements, and omitted material facts, to get false and fraudulent claims paid or approved, and/or that were material to a false claim, within the meaning of 31 U.S.C. § 3729(a)(2) (1986) and 31 U.S.C. § 3729(a)(1)(B) (2009).

115.     The United States, unaware of the falsity of the records, statements and claims made or caused to be made by the defendants, paid claims that would not have been paid but for Defendants' unlawful conduct.

116.     By reason of the Defendants' acts, the United States has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

117.     Additionally, the United States is entitled to the maximum penalty of $11,000 for each and every false and fraudulent claim caused to be made by Defendants arising from their unlawful conduct as described herein.

### Count II

**False Claims Act 31 U.S.C. §§ 3729(a)(3)(1986) and as amended by the Fraud Enforcement and Recovery Act, Pub. L. No. 111-21 (2009)**
**(All Defendants)**

118.     Relator repeats and realleges each and every allegation contained in paragraphs 1 through 110 above as though fully set forth herein.

119.     This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729, *et seq.,* as amended.

120.     By virtue of the acts described above, Defendants agreed to provide financial inducements to health care providers to generate sales in violation of the Anti-Kickback Statute

1   and conspired to violate the False Claims Act within the meaning of 31 U.S.C. § 3729(a)(3)(1986)

2   and 31 U.S.C. § 3729(a)(1)(C) (2009).

3      121.   The United States, unaware of the conspiracy to violate the False Claims Act, paid

4   claims that would not have been paid but for Defendants' unlawful conduct.

5      122.   By reason of the Defendants' acts, the United States has been damaged, and

6   continues to be damaged, in substantial amount to be determined at trial.

7      123.   Additionally, the United States is entitled to the maximum penalty of $11,000

8   against each defendant for the conspiracy to violate the False Claims Act.

9                    **CLAIMS ON BEHALF OF THE STATES**

10                              **Count III**

11
12                        **California False Claims Act**
                           **Cal. Gov't Code § 12650, *et seq.***
13   **(Defendants Biotronik, Inc., Western Medical, Inc., Caesar Fonte, Peter Elia, Leon Feldman)**

14      124.   Relator repeats and realleges each and every allegation contained in paragraphs 1

15   through 110 above as though fully set forth herein.

16      125.   This is a claim for treble damages and penalties against Defendants Biotronik,

17   Inc., Western Medical, Inc., Caesar Fonte, Peter Elia, and Leon Feldman under the California

18   False Claims Act, Cal. Gov't Code §12650, *et seq.*

19      126.   By virtue of the acts described above, Defendants knowingly submitted or caused

20   to be presented, false or fraudulent claims to the California State Government for payment or

21   approval.

22      127.   By virtue of the acts described above, Defendants knowingly made, used, or

23   caused to be made or used false records and statements, and omitted material facts to induce the

24   California State Government to approve and pay such false and fraudulent claims and or that were

25   material to such false and fraudulent claims.

26      128.   By virtue of the acts described above, Defendants conspired to violate the

27   California False Claims Act.

28      129.   The State of California, unaware of the falsity of the records, statements and

1  claims made, used, presented or caused to be presented or caused to be made or used by

2  Defendants paid and continues to pay the claims that would not be paid but for Defendants' illegal

3  inducements.

4     130.    By reason of the Defendants' acts, the State of California has been damaged and

5  continues to be damaged in substantial amounts to be determined at trial.

6     131.    The State of California is entitled to the maximum penalty of $10,000 for each and

7  every false or fraudulent claim, record or statement made, used, presented or caused to be made,

8  used, or presented by defendants.

**Count IV**

9

**Colorado Medicaid False Claims Act**
**Col. Rev. Stat. § 25.5-4-303.5, *et seq.***
**(Defendant Biotronik, Inc.)**

10

11

12     132.    Relator repeats and realleges each and every allegation contained in paragraphs 1

13  through 110 above as though fully set forth herein.

14     133.    This is a claim for treble damages and penalties against Defendant Biotronik under

15  the Colorado Medicaid False Claims Act, Col. Rev. Stat. § 25.5-4-303.5, *et seq.*

16     134.    By virtue of the acts described above, Defendant Biotronik knowingly caused to

17  be presented, false or fraudulent claims to the State of Colorado.

18     135.    By virtue of the acts described above, Defendant Biotronik knowingly made, used,

19  or caused to be made or used false records and statements, and omitted material facts to induce the

20  State of Colorado to approve and pay such false and fraudulent claims.

21     136.    The State of Colorado, unaware of the falsity of the records, statements and claims

22  made, used, presented or caused to be presented or caused to be made or used by Defendant

23  Biotronik paid and continues to pay the claims that would not be paid but for Defendant

24  Biotronik's illegal inducements.

25     137.    By reason of Defendant Biotronik's acts, the State of Colorado has been damaged

26  and continues to be damaged in substantial amounts to be determined at trial.

27     138.    The State of Colorado is entitled to the maximum penalty of $10,000 for each and

28  every false or fraudulent claim, record or statement made, used, presented or caused to be made,

1  used, or presented by Defendant Biotronik.

2                              **Count V**

3
4              **Connecticut False Claims Act**
              **Conn. Gen. Stat. § 17b-301a,** *et seq.*
5                    **(Defendant Biotronik, Inc.)**

6        139.    Relator repeats and realleges each and every allegation contained in paragraphs 1

7  through 110 above as though fully set forth herein.

8        140.    This is a claim for treble damages and penalties against Defendant Biotronik under

9  the Connecticut False Claims Act, Conn. Gen. Stat. § 17b-301a, *et seq.*

10        141.    By virtue of the acts described above, Defendant Biotronik knowingly caused to

11  be presented, false or fraudulent claims to the State of Connecticut.

12        142.    By virtue of the acts described above, Defendant Biotronik knowingly made, used,

13  or caused to be made or used false records and statements, and omitted material facts to induce the

14  State of Connecticut to approve and pay such false and fraudulent claims.

15        143.    The State of Connecticut, unaware of the falsity of the records, statements and

16  claims made, used, presented or caused to be presented or caused to be made or used by Defendant

17  Biotronik paid and continues to pay the claims that would not be paid but for Defendant

18  Biotronik's illegal inducements.

19        144.    By reason of Defendant Biotronik's acts, the State of Connecticut has been

20  damaged and continues to be damaged in substantial amounts to be determined at trial.

21        145.    The State of Connecticut is entitled to the maximum penalty of $10,000 for each

22  and every false or fraudulent claim, record or statement made, used, presented or caused to be

23  made, used, or presented by Defendant Biotronik.

24                              **Count VI**

25        **Delaware False Claims and False Reporting Act**
        **6 Del. C. § 1201,** *et seq.*
26              **(Defendant Biotronik, Inc.)**

27        146.    Relator repeats and realleges each and every allegation contained in paragraphs 1

28  through 110 above as though fully set forth herein.

{00038736; 1}                    THIRD AMENDED COMPLAINT
                                          37

147.    This is a claim for treble damages and penalties against Defendant Biotronik under the Delaware False Claims and False Reporting Act, 6 Del. C. § 1201, *et seq.*

148.    By virtue of the acts described above, Defendant Biotronik knowingly caused to be presented, false or fraudulent claims to the Delaware State Government for payment or approval.

149.    By virtue of the acts described above, Defendant Biotronik knowingly made, used, or caused to be made or used false records and statements, and omitted material facts to induce the Delaware State Government to approve and pay such false and fraudulent claims.

150.    The State of Delaware, unaware of the falsity of the records, statements and claims made, used, presented or caused to be presented or caused to be made or used by Defendant Biotronik paid and continues to pay the claims that would not be paid but for Defendant Biotronik's illegal inducements.

151.    By reason of Defendant Biotronik's acts, the State of Delaware has been damaged and continues to be damaged in substantial amounts to be determined at trial.

152.    The State of Delaware is entitled to the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used, or presented by Defendant Biotronik.

## **Count VII**

### **Florida False Claims Act**
### **Fla. Stat. Ann. § 68.081, *et seq.***
### **(Defendant Biotronik, Inc.)**

153.    Relator repeats and realleges each and every allegation contained in paragraphs 1 through 110 above as though fully set forth herein.

154.    This is a claim for treble damages and penalties against Defendant Biotronik under the Florida False Claims Act, Fla. Stat. Ann. § 68.081 *et seq.*

155.    By virtue of the acts described above, Defendant Biotronik knowingly caused to be presented, false or fraudulent claims to the Florida State Government for payment or approval.

156.    By virtue of the acts described above, Defendant Biotronik knowingly made, used,

1  or caused to be made or used false records and statements, and omitted material facts to induce the

2  Florida State Government to approve and pay such false and fraudulent claims.

3       157.  The State of Florida, unaware of the falsity of the records, statements and claims

4  made, used, presented or caused to be presented or caused to be made or used by Defendant

5  Biotronik paid and continues to pay the claims that would not be paid but for Defendant

6  Biotronik's illegal inducements.

7       158.  By reason of Defendant Biotronik's acts, the State of Florida has been damaged

8  and continues to be damaged in substantial amounts to be determined at trial.

9       159.  The State of Florida is entitled to the maximum penalty of $11,000 for each and

10  every false or fraudulent claim, record or statement made, used, presented or caused to be made,

11  used, or presented by Defendant Biotronik.

12  **Count VIII**

13
14  **Georgia False Medicaid Claims Act**
**Ga. Code Ann. § 49-4-168,** *et seq.*
**(Defendant Biotronik, Inc.)**

15
16       160.  Relator repeats and realleges each and every allegation contained in paragraphs 1

through 110 above as though fully set forth herein.

17
18       161.  This is a claim for treble damages and penalties against Defendant Biotronik under

the Georgia False Medicaid Claims Act, Ga. Code Ann. § 49-4-168 *et seq*.

19
20       162.  By virtue of the acts described above, Defendant Biotronik knowingly caused to

be presented, false or fraudulent claims to the State of Georgia.

21
22       163.  By virtue of the acts described above, Defendant Biotronik knowingly made, used,

23  or caused to be made or used false records and statements, and omitted material facts to induce the

State of Georgia to approve and pay such false and fraudulent claims.

24
25       164.  The State of Georgia, unaware of the falsity of the records, statements and claims

26  made, used, presented or caused to be presented or caused to be made or used by Defendant

Biotronik paid and continues to pay the claims that would not be paid but for Defendant

27  Biotronik's illegal inducements.

28

165.   By reason of Defendant Biotronik's acts, the State of Georgia has been damaged and continues to be damaged in substantial amounts to be determined at trial.

166.   The State of Georgia is entitled to the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used, or presented by Defendant Biotronik.

**Count IX**

**Hawaii False Claims Act**
**Haw. Rev. Stat. § 661-21, *et seq.***
**(Defendant Biotronik, Inc.)**

167.   Relator repeats and realleges each and every allegation contained in paragraphs 1 through 110 above as though fully set forth herein.

168.   This is a claim for treble damages and penalties against Defendant Biotronik under the Hawaii False Claims Act, Haw. Rev. Stat. § 661-21, *et seq.*

169.   By virtue of the acts described above, Defendant Biotronik knowingly caused to be presented, false or fraudulent claims to the State of Hawaii.

170.   By virtue of the acts described above, Defendant Biotronik knowingly made, used, or caused to be made or used false records and statements, and omitted material facts to induce the State of Hawaii to approve and pay such false and fraudulent claims.

171.   The State of Hawaii, unaware of the falsity of the records, statements and claims made, used, presented or caused to be presented or caused to be made or used by Defendant Biotronik paid and continues to pay the claims that would not be paid but for Defendant Biotronik's illegal inducements.

172.   By reason of Defendant Biotronik's acts, the State of Hawaii has been damaged and continues to be damaged in substantial amounts to be determined at trial.

173.   The State of Hawaii is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used presented or caused to be made, used, or presented by Defendant Biotronik.

**Count X**

**Illinois Whistleblower Reward and Protection Act
740 Ill. Comp. Stat.§ 175/1-8
(Defendant Biotronik, Inc.)**

174.    Relator repeats and realleges each and every allegation contained in paragraphs 1 through 110 above as though fully set forth herein.

175.    This is a claim for treble damages and penalties against Defendant Biotronik under the Illinois Whistleblower Reward and Protection Act, 740 Ill. Comp. Stat.§ 175/1-8.

176.    By virtue of the acts described above, Defendant Biotronik knowingly caused to be presented, false or fraudulent claim sot the Illinois State Government for payment or approval.

177.    By virtue of the acts described above, Defendant Biotronik knowingly made, used, or caused to be made or used false records and statements, and omitted material facts to induce the Illinois State Government to approve and pay such false and fraudulent claims.

178.    The State of Illinois, unaware of the falsity of the records, statements and claims made, used, presented or caused to be presented or caused to be made or used by Defendant Biotronik paid and continues to pay the claims that would not be paid but for Defendant Biotronik's illegal inducements.

179.    By reason of Defendant Biotronik's acts, the State of Illinois has been damaged and continues to be damaged in substantial amounts to be determined at trial.

180.    The State of Illinois is entitled to the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used, or presented by Defendant Biotronik.

## Count XI

**Indiana False Claims and Whistleblower Protection Act
Ind. Code Ann. § 5-11-5.5-1, *et seq.*
(Defendant Biotronik, Inc.)**

181.    Relator repeats and realleges each and every allegation contained in paragraphs 1 through 110 above as though fully set forth herein.

182.    This is a claim for treble damages and penalties against Defendant Biotronik under the Indiana False Claims and Whistleblower Protection Act, Ind. Code Ann. § 5-11-5.5-1, *et seq.*

183.    By virtue of the acts described above, Defendant Biotronik knowingly caused to

1   be presented, false or fraudulent claims to the State of Indiana.

2        184.    By virtue of the acts described above, Defendant Biotronik knowingly made, used,

3   or caused to be made or used false records and statements, and omitted material facts to induce the

4   State of Indiana to approve and pay such false and fraudulent claims.

5        185.    State of Indiana, unaware of the falsity of the records, statements and claims made,

6   used, presented or caused to be presented or caused to be made or used by Defendant Biotronik

7   paid and continues to pay the claims that would not be paid but for Defendants' illegal

8   inducements.

9        186.    By reason of Defendant Biotronik's acts, the State of Indiana has been damaged

10  and continues to be damaged in substantial amounts to be determined at trial.

11       187.    The State of Indiana is entitled to a penalty of at least $5,000 for each and every

12  false or fraudulent claim, record or statement made, used, presented or caused to be made, used, or

13  presented by Defendant Biotronik.

14  **Count XII**

15  **Louisiana Medical Assistance Programs Integrity Law**
16  **La. Rev. Stat. § 46:437.1, *et seq.***
    **(Defendant Biotronik, Inc.)**

17       188.    Relator repeats and realleges each and every allegation contained in paragraphs 1

18  through 110 above as though fully set forth herein.

19       189.    This is a claim for treble damages and penalties against Defendant Biotronik under

20  the Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. § 46:437.1, *et seq.*

21       190.    By virtue of the acts described above, Defendant Biotronik knowingly caused to

22  be presented, false or fraudulent claims to the State of Louisiana.

23       191.    By virtue of the acts described above, Defendant Biotronik knowingly made, used,

24  or caused to be made or used false records and statements, and omitted material facts to induce the

25  State of Louisiana to approve and pay such false and fraudulent claims.

26       192.    The State of Louisiana, unaware of the falsity of the records, statements and

27  claims made, used, presented or caused to be presented or caused to be made or used by Defendant

28  Biotronik paid and continues to pay the claims that would not be paid but for Defendant

1  Biotronik's illegal inducements.

2       193.    By reason of Defendant Biotronik's acts, the State of Louisiana has been damaged

3  and continues to be damaged in substantial amounts to be determined at trial.

4       194.    The State of Louisiana is entitled to the maximum penalty of $10,000 for each and

5  every false or fraudulent claim, record or statement made, used, presented or caused to be made,

6  used, or presented by Defendant Biotronik.

7                              **Count XIII**

8
                    **Maryland False Health Claims Act**
9           **Md. Code Ann., Health-Gen. §  2-601, *et seq*.**
                    **(Defendant Biotronik, Inc.)**
10
        195.    Relator repeats and realleges each and every allegation contained in paragraphs 1
11
    through 110 above as though fully set forth herein.
12
        196.    This is a claim for treble damages and penalties against Defendant Biotronik under
13
    the Maryland False Health Claims Act.
14
        197.    By virtue of the acts described above, Defendant Biotronik knowingly caused to
15
    be presented, false or fraudulent claims to the Maryland State Government for payment or
16
    approval.
17
        198.    By virtue of the acts described above, Defendant Biotronik knowingly made, used,
18
    or caused to be made or used false records and statements, and omitted material facts to induce the
19
    Maryland State Government to approve and pay such false and fraudulent claims.
20
        199.    The State of Maryland, unaware of the falsity of the records, statements and
21
    claims made, used, presented or caused to be presented or caused to be made or used by Defendant
22
    Biotronik paid and continues to pay the claims that would not be paid but for Defendant
23
    Biotronik's illegal inducements.
24
        200.    By reason of Defendant Biotronik's acts, the State of Maryland has been damaged
25
    and continues to be damaged in substantial amounts to be determined at trial.
26
        201.    The State of Maryland is entitled to the maximum civil penalties of $10,000 for
27
    each and every false or fraudulent claim, record or statement made, used, presented or caused to
28

1   be made, used, or presented by Defendant Biotronik.

2

3

4   ### Count XIV

5   **Massachusetts False Claims Law**
    **Mass. Gen. Laws ch. 12 §5A, *et seq*.**
6   **(Defendant Biotronik, Inc.)**

7   202.    Relator repeats and realleges each and every allegation contained in paragraphs 1

8   through 110 above as though fully set forth herein.

9   203.    This is a claim for treble damages and penalties against Defendant Biotronik under

10  the Massachusetts False Claims Law, Mass. Gen. Laws ch.12 §5A, *et seq*.

11  204.    By virtue of the acts described above, Defendant Biotronik knowingly caused to

12  be presented, false or fraudulent claims to the Massachusetts State Government for payment or

13  approval.

14  205.    By virtue of the acts described above, Defendant Biotronik knowingly made, used,

15  or caused to be made or used false records and statements, and omitted material facts to induce the

16  Massachusetts State Government to approve and pay such false and fraudulent claims.

17  206.    The State of Massachusetts, unaware of the falsity of the records, statements and

18  claims made, used, presented or caused to be presented or caused to be made or used by Defendant

19  Biotronik paid and continues to pay the claims that would not be paid but for Defendant

20  Biotronik's illegal inducements.

21  207.    By reason of Defendant Biotronik's acts, the State of Massachusetts has been

22  damaged and continues to be damaged in substantial amounts to be determined at trial.

23  208.    The State of Massachusetts is entitled to the maximum penalty of $10,000 for each

24  and every false or fraudulent claim, record or statement made, used, presented or caused to be

25  made, used, or presented by Defendant Biotronik.

26

27

28

{00038736; 1}                     THIRD AMENDED COMPLAINT
                                              44

**Count XV**

**Michigan Medicaid False Claims Act**
**Mich. Comp. Laws § 400.601, *et seq*.**
**(Defendant Biotronik, Inc.)**

209.     Relator repeats and realleges each and every allegation contained in paragraphs 1 through 110 above as though fully set forth herein.

210.     This is a claim for treble damages and penalties against Defendant Biotronik under the Michigan Medicaid False Claims Act, Mich. Comp. Laws § 400.601, *et seq*.

211.     By virtue of the acts described above, Defendant Biotronik knowingly caused to be presented, false or fraudulent claims to the Michigan State Government for payment or approval.

212.     By virtue of the acts described above, Defendant Biotronik knowingly made, used, or caused to be made or used false records and statements, and omitted material facts to induce the Michigan State Government to approve and pay such false and fraudulent claims.

213.     The State of Michigan, unaware of the falsity of the records, statements and claims made, used, presented or caused to be presented or caused to be made or used by Defendant Biotronik paid and continues to pay the claims that would not be paid but for Defendant Biotronik's illegal inducements.

214.     By reason of Defendant Biotronik's acts, the State of Michigan has been damaged and continues to be damaged in substantial amounts to be determined at trial.

215.     The State of Michigan is entitled to the maximum civil penalties for each and every violation of the Mich. Comp. Laws § 400.603(1), (2) and § 400.606(1).

**Count XVI**

**Minnesota False Claims Act**
**Minn. Stat. § 15C.01, *et seq*.**
**(Defendant Biotronik, Inc.)**

216.     Relator repeats and realleges each and every allegation contained in paragraphs 1 through 110 above as though fully set forth herein.

217.     This is a claim for treble damages and penalties against Defendant Biotronik under

1    the Minnesota False Claims Act, Minn. Stat. § 15C.01, *et seq.*

2         218.    By virtue of the acts described above, Defendant Biotronik knowingly caused to

3    be presented, false or fraudulent claims to the Minnesota State Government for payment or

4    approval.

5         219.    By virtue of the acts described above, Defendant Biotronik knowingly made, used,

6    or caused to be made or used false records and statements, and omitted material facts to induce the

7    Minnesota State Government to approve and pay such false and fraudulent claims.

8         220.    The State of Minnesota, unaware of the falsity of the records, statements and

9    claims made, used, presented or caused to be presented or caused to be made or used by Defendant

10   Biotronik paid and continues to pay the claims that would not be paid but for Defendant

11   Biotronik's illegal inducements.

12        221.    By reason of Defendant Biotronik's acts, the State of Minnesota has been

13   damaged and continues to be damaged in substantial amounts to be determined at trial.

14        222.    The State of Minnesota is entitled to the maximum civil penalties of $11,000 for

15   each and every false or fraudulent claim, record or statement made, used, presented or caused to

16   be made, used, or presented by Defendant Biotronik.

17                                    **Count XVII**

18                            **Montana False Claims Act**
19                      **Mont. Code Ann. § 17-8-401, *et seq.***
                            **(Defendant Biotronik, Inc.)**
20
         223.    Relator repeats and realleges each and every allegation contained in paragraphs 1
21
     through 110 above as though fully set forth herein.
22
         224.    This is a claim for treble damages and penalties against Defendant Biotronik under
23
     the Montana False Claims Act, Mont. Code Ann. § 17-8-401, *et seq.*
24
         225.    By virtue of the acts described above, Defendant Biotronik knowingly caused to
25
     be presented, false or fraudulent claims to the Montana State Government for payment or
26
     approval.
27
         226.    By virtue of the acts described above, Defendant Biotronik knowingly made, used,
28

1  or caused to be made or used false records and statements, and omitted material facts to induce the

2  Montana State Government to approve and pay such false and fraudulent claims.

3       227.    The State of Montana, unaware of the falsity of the records, statements and claims

4  made, used presented or caused to be presented or caused to be made or used by Defendant

5  Biotronik paid and continues to pay the claims that would not be paid but for Defendant

6  Biotronik's illegal inducements.

7       228.    By reason of Defendant Biotronik's acts, the State of Montana has been damaged

8  and continues to be damaged in substantial amounts to be determined at trial.

9       229.    The State of Montana is entitled to the maximum penalty of $10,000 for each and

10  every false or fraudulent claim, record or statement made, used, presented or caused to be made,

11  used, or presented by Defendant Biotronik.

12  **Count XVIII**

13
14  **Nevada False Claims Act**
**Nev. Rev. Stat. Ann. § 357.010,** *et seq.*
**(Defendants Biotronik, Inc., Western Medical, Inc., Casear Fonte, Peter Elia, Robert N.**
**Berkley, W. Judson Fisher,  Arjun V. Gururaj,  William H. Resh., Robert C. Wesley,**
**Nevada Heart and Vascular Center, LLP)**

15

16
17       230.    Relator repeats and realleges each and every allegation contained in paragraphs 1

through 110 above as though fully set forth herein.

18
19       231.    This is a claim for treble damages and penalties against Defendants Biotronik,

Western Medical, Casear Fonte, Peter Elia, Robert N. Berkeley, Arjun V. Gururaj, William H.

20  Resh, Robert C. Wesley, and Nevada Heart and Vascular Center under the Nevada False Claims

21  Act, Nev. Rev. Stat. Ann. § 357.010, *et seq*.

22
23       232.    By virtue of the acts described above, Defendants knowingly submitted or caused

to be presented, false or fraudulent claims to the Nevada State Government.

24
25       233.    By virtue of the acts described above, Defendants knowingly made, used, or

caused to be made or used false records and statements, and omitted material facts to induce the

26  Nevada State Government to approve and pay such false and fraudulent claims.

27       234.    The State of Nevada, unaware of the falsity of the records, statements and claims

28

made, used, presented or caused to be presented or caused to be made or used by Defendants paid and continues to pay the claims that would not be paid but for Defendants' illegal inducements.

235.    By reason of the Defendants' acts, the State of Nevada has been damaged and continues to be damaged in substantial amounts to be determined at trial.

236.    The State of Nevada is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used, or presented by defendants.

**Count XIX**

**New Hampshire False Claims Act**
**N.H. Rev. Stat. Ann. § 167:61-b, *et seq.***
**(Defendant Biotronik, Inc.)**

237.    Relator repeats and realleges each and every allegation contained in paragraphs 1 through 110 above as though fully set forth herein.

238.    This is a claim for treble damages and penalties against Defendant Biotronik under the New Hampshire False Claims Act, N.H. Rev. Stat. Ann. § 167:61-b, *et seq.*

239.    By virtue of the acts described above, Defendant Biotronik knowingly caused to be presented, false or fraudulent claims to the New Hampshire State Government for payment or approval.

240.    By virtue of the acts described above, Defendant Biotronik knowingly made, used, or caused to be made or used false records and statements, and omitted material facts to induce the New Hampshire State Government to approve and pay such false and fraudulent claims.

241.    The State of New Hampshire, unaware of the falsity of the records, statements and claims made, used, presented or caused to be presented or caused to be made or used by Defendant Biotronik paid and continues to pay the claims that would not be paid but for Defendant Biotronik's illegal inducements.

242.    By reason of Defendant Biotronik's acts, the State of New Hampshire has been damaged and continues to be damaged in substantial amounts to be determined at trial.

243.    The State of New Hampshire is entitled to the maximum penalty of $10,000 for

each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used, or presented by Defendant Biotronik.

### Count XX

**New Jersey False Claims Act**
**N.J. Stat. § 2A:32C-1, *et seq.***
**(Defendant Biotronik, Inc.)**

244.    Relator repeats and realleges each and every allegation contained in paragraphs 1 through 110 above as though fully set forth herein.

245.    This is a claim for treble damages and penalties against Defendant Biotronik under the New Jersey False Claims Act, N.J. Stat. § 2A:32C-1, *et seq.*

246.    By virtue of the acts described above, Defendant Biotronik knowingly caused to be presented, false or fraudulent claims to the New Jersey State Government for payment or approval.

247.    By virtue of the acts described above, Defendant Biotronik knowingly made, used, or caused to be made or used false records and statements, and omitted material facts to induce the New Jersey State Government to approve and pay such false and fraudulent claims.

248.    The State of New Jersey, unaware of the falsity of the records, statements and claims made, used presented or caused to be presented or caused to be made or used by Defendant Biotronik paid and continues to pay the claims that would not be paid but for Defendant Biotronik's illegal inducements.

249.    By reason of Defendant Biotronik's acts, the State of New Jersey has been damaged and continues to be damaged in substantial amounts to be determined at trial.

250.    The State of New Jersey is entitled to the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used presented or caused to be made, used, or presented by Defendant Biotronik.

1
2

**Count XXI**

3
4

**New Mexico Medicaid False Claims Act**
**N.M. Stat. Ann. § 27-14-1, *et seq*.**
**(Defendant Biotronik, Inc.)**

5       251.    Relator repeats and realleges each and every allegation contained in paragraphs 1

6   through 110 above as though fully set forth herein.

7       252.    This is a claim for treble damages and penalties against Defendant Biotronik under

8   the New Mexico Medicaid False Claims Act, N.M. Stat. Ann. § 27-14-1, *et seq.*

9       253.    By virtue of the acts described above, Defendant Biotronik knowingly caused to

10  be presented, false or fraudulent claims to the New Mexico State Government for payment or

11  approval.

12      254.    By virtue of the acts described above, Defendant Biotronik knowingly made, used,

13  or caused to be made or used false records and statements, and omitted material facts to induce the

14  New Mexico State Government to approve and pay such false and fraudulent claims.

15      255.    The State of New Mexico, unaware of the falsity of the records, statements and

16  claims made, used, presented or caused to be presented or caused to be made or used by Defendant

17  Biotronik paid and continues to pay the claims that would not be paid but for Defendant

18  Biotronik's illegal inducements.

19      256.    By reason of Defendant Biotronik's acts, the State of New Mexico has been

20  damaged and continues to be damaged in substantial amounts to be determined at trial.

21      257.    The State of New Mexico is entitled to the maximum penalty of $10,000 for each

22  and every false or fraudulent claim, record or statement made, used presented or caused to be

23  made, used, or presented by Defendant Biotronik.

24
25
26
27
28

## Count XXII

**New York False Claims Act**
**N.Y. State Fin. § 187, *et seq.***
**(Defendant Biotronik, Inc.)**

258.     Relator repeats and realleges each and every allegation contained in paragraphs 1 through 110 above as though fully set forth herein.

259.     This is a claim for treble damages and penalties against Defendant Biotronik under the New York False Claims Act, N.Y. State Fin. § 187, *et seq.*

260.     By virtue of the acts described above, Defendant Biotronik knowingly caused to be presented, false or fraudulent claims to the New York State Government for payment or approval.

261.     By virtue of the acts described above, Defendant Biotronik knowingly made, used, or caused to be made or used false records and statements, and omitted material facts to induce the New York State Government to approve and pay such false and fraudulent claims.

262.     The State of New York, unaware of the falsity of the records, statements and claims made, used, presented or caused to be presented or caused to be made or used by Defendant Biotronik paid and continues to pay the claims that would not be paid but for Defendant Biotronik's illegal inducements.

263.     By reason of Defendant Biotronik's acts, the State of New York has been damaged and continues to be damaged in substantial amounts to be determined at trial.

264.     The State of New York is entitled to the maximum penalty of $12,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used, or presented by Defendant Biotronik.

## Count XXIII

**North Carolina False Claims Act**
**N.C. Gen. Stat. § 1-605, *et seq.***
**(Defendant Biotronik, Inc.)**

265.     Relator repeats and realleges each and every allegation contained in paragraphs 1 through 110 above as though fully set forth herein.

266.     This is a claim for treble damages and penalties against Defendant Biotronik under the North Carolina False Claims Act, N. C. Gen. Stat. §1-605, *et seq.*

267.     By virtue of the acts described above, Defendant Biotronik knowingly caused to be presented, false or fraudulent claims to the North Carolina State Government for payment or approval.

268.     By virtue of the acts described above, Defendant Biotronik knowingly made, used, or caused to be made or used false records and statements, and omitted material facts to induce the North Carolina State Government to approve and pay such false and fraudulent claims.

269.     The State of North Carolina, unaware of the falsity of the records, statements and claims made, used, presented or caused to be presented or caused to be made or used by Defendant Biotronik paid and continues to pay the claims that would not be paid but for Defendant Biotronik's illegal inducements.

270.     By reason of Defendant Biotronik's acts, the State of North Carolina has been damaged and continues to be damaged in substantial amounts to be determined at trial.

271.     The State of North Carolina is entitled to the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used, or presented by Defendant Biotronik.

## **Count XXIV**

### **Oklahoma Medicaid False Claims Act**
### **Okla. Stat. Tit. 63 § 5053, *et seq.***
### **(Defendant Biotronik, Inc.)**

272.     Relator repeats and realleges each and every allegation contained in paragraphs 1 through 110 above as though fully set forth herein.

273.     This is a claim for treble damages and penalties against Defendant Biotronik under the Oklahoma Medicaid False Claims Act, Okla. Stat. tit. 63 § 5053, *et seq.*

274.     By virtue of the acts described above, Defendant Biotronik knowingly caused to be presented, false or fraudulent claims to the Oklahoma State Government for payment or approval.

275.     By virtue of the acts described above, Defendant Biotronik knowingly made, used, or caused to be made or used false records and statements, and omitted material facts to induce the Oklahoma State Government to approve and pay such false and fraudulent claims.

276.     The State of Oklahoma, unaware of the falsity of the records, statements and claims made, used, presented or caused to be presented or caused to be made or used by Defendant Biotronik paid and continues to pay the claims that would not be paid but for Defendant Biotronik's illegal inducements.

277.     By reason of Defendant Biotronik's acts, the State of Oklahoma has been damaged and continues to be damaged in substantial amounts to be determined at trial.

278.     The State of Oklahoma is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used, or presented by Defendant Biotronik.

**Count XXV**

**Rhode Island False Claims Act**
**R.I. Gen. Laws. § 9-1.1-1, *et seq*.**
**(Defendant Biotronik, Inc.)**

279.     Relator repeats and realleges each and every allegation contained in paragraphs 1 through 110 above as though fully set forth herein.

280.     This is a claim for treble damages and penalties against Defendant Biotronik under the Rhode Island False Claims Act, R.I. Gen. Laws § 9-1.1-1, *et seq*.

281.     By virtue of the acts described above, Defendant Biotronik's knowingly caused to be presented, false or fraudulent claims to the State of Rhode Island.

282.     By virtue of the acts described above, Defendant Biotronik's knowingly made, used, or caused to be made or used false records and statements, and omitted material facts to induce the State of Rhode Island to approve and pay such false and fraudulent claims.

283.     The State of Rhode Island, unaware of the falsity of the records, statements and claims made, used, presented or caused to be presented or caused to be made or used by Defendant Biotronik paid and continues to pay the claims that would not be paid but for Defendant

Biotronik's illegal inducements.

284.     By reason of Defendant Biotronik's acts, the State of Rhode Island has been damaged and continues to be damaged in substantial amounts to be determined at trial.

285.     The State of Rhode Island is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used, or presented by Defendant Biotronik.

## Count XXVI

**Tennessee Medicaid False Claims Act,
Tenn. Code Ann. § 71-5-181, *et seq*.
(Defendant Biotronik, Inc.)**

286.     Relator repeats and realleges each and every allegation contained in paragraphs 1 through 110 above as though fully set forth herein.

287.     This is a claim for treble damages and penalties against Defendant Biotronik under the Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-181, *et seq*.

288.     By virtue of the acts described above, Defendant Biotronik knowingly caused to be presented, false or fraudulent claims to the State of Tennessee.

289.     By virtue of the acts described above, Defendant Biotronik knowingly made, used, or caused to be made or used false records and statements, and omitted material facts to induce the State of Tennessee to approve and pay such false and fraudulent claims.

290.     The State of Tennessee, unaware of the falsity of the records, statements and claims made, used, presented or caused to be presented or caused to be made or used by Defendant Biotronik paid and continues to pay the claims that would not be paid but for Defendant Biotronik's illegal inducements.

291.     By reason of Defendant Biotronik's acts, the State of Tennessee has been damaged and continues to be damaged in substantial amounts to be determined at trial.

292.     The State of Tennessee is entitled to the maximum penalty of $25,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used, or presented by Defendant Biotronik.

**Count XXVII**

**Texas Medicaid Fraud Prevention Law**
**Tex. Hum. Res. Code Ann. § 36.001, *et seq*.**
**(Defendant Biotronik, Inc.)**

293.    Relator repeats and realleges each and every allegation contained in paragraphs 1 through 110 above as though fully set forth herein.

294.    This is a claim for treble damages and penalties against Defendant Biotronik under the Texas Medicaid Fraud Prevention Law, Tex. Hum. Res. Code Ann. § 36.001, *et seq*.

295.    By virtue of the acts described above, Defendant Biotronik knowingly caused to be presented, false or fraudulent claims to the State of Texas.

296.    By virtue of the acts described above, Defendant Biotronik knowingly made, used, or caused to be made or used false records and statements, and omitted material facts to induce the Texas State Government to approve and pay such false and fraudulent claims.

297.    The State of Texas, unaware of the falsity of the records, statements and claims made, used, presented or caused to be presented or caused to be made or used by Defendant Biotronik paid and continues to pay the claims that would not paid but for Defendant Biotronik's illegal inducements.

298.    By reasons of the Defendant Biotronik's acts, the State of Texas has been damaged and continues to be damaged in substantial amounts to be determined at trial.

299.    The State of Texas is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used, or presented by Defendant Biotronik.

**Count XXVIII**

**Virginia Fraud Against Taxpayers Act**
**Va. Code Ann. § 8.01-216.1, *et seq*.**
**(Defendant Biotronik, Inc.)**

300.    Relator repeats and realleges each and every allegation contained in paragraphs 1 through 110 above as though fully set forth herein.

301.    This is a claim for treble damages and penalties against Defendant Biotronik under

the Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.1, *et seq*.

302.   By virtue of the acts described above, Defendant Biotronik knowingly caused to be presented, false or fraudulent claims to the State of Virginia.

303.   By virtue of the acts described above, Defendant Biotronik knowingly made, used, or caused to be made or used false records and statements, and omitted material facts to induce the Virginia State Government to approve and pay such false and fraudulent claims.

304.   The State of Virginia, unaware of the falsity of the records, statements and claims made, used presented or caused to be presented or caused to be made or used by Defendant Biotronik paid and continues to pay the claims that would not be paid but for Defendant Biotronik's illegal inducements.

305.   By reason of Defendant Biotronik's acts, the State of Virginia has been damaged and continues to be damaged in substantial amounts to be determined at trial.

306.   The State of Virginia is entitled to the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used, or presented by Defendant Biotronik.

### Count XXIX

**Wisconsin False Claims for Medical Assistance Law**
**Wis. Stat. § 20.931, *et seq*.**
**(Defendant Biotronik, Inc.)**

307.   Relator repeats and realleges each and every allegation contained in paragraphs 1 through 110 above as though fully set forth herein.

308.   This is a claim for treble damages and penalties against Defendant Biotronik under the Wisconsin False Claims for Medical Assistance Law, Wis. Stat. § 20.931, *et seq*.

309.   By virtue of the acts described above, Defendant Biotronik knowingly caused to be presented, false or fraudulent claims to the State of Wisconsin.

310.   By virtue of the acts described above, Defendant Biotronik knowingly made, used, or caused to be made or used false records and statements, and omitted material facts to induce the State of Wisconsin to approve and pay such false and fraudulent claims.

311.    The State of Wisconsin, unaware of the falsity of the records, statements and claims made, used presented or caused to be presented or caused to be made or used by Defendant Biotronik paid and continues to pay the claims that would not be paid but for Defendant Biotronik's illegal inducements.

312.    By reason of Defendant Biotronik's acts, the State of Wisconsin has been damaged and continues to be damaged in substantial amounts to be determined at trial.

313.    The State of Wisconsin is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used, or presented by Defendant Biotronik.

## **Count XXX**

### **District of Columbia Procurement Act**
### **D.C. Cod. § 2-308.13, *et seq.***
### **(Defendant Biotronik, Inc.)**

314.    Relator repeats and realleges each and every allegation contained in paragraphs 1 through 110 above as though fully set forth herein.

315.    This is a claim for treble damages and penalties against Defendant Biotronik under the District of Columbia Procurement Act., D.C. Code § 2-308.13, *et seq.*

316.    By virtue of the acts described above, Defendant Biotronik knowingly caused to be presented, false or fraudulent claims to the District of Columbia.

317.    By virtue of the acts described above, Defendant Biotronik knowingly made, used, or caused to be made or used false records and statements, and omitted material facts to induce the District of Columbia to approve and pay such false and fraudulent claims.

318.    The District of Columbia, unaware of the falsity of the records, statements and claims made, used, presented or caused to be presented or caused to be made or used by Defendant Biotronik paid and continues to pay the claims that would not be paid but for Defendant Biotronik's illegal inducements.

319.    By reason of Defendant Biotronik's acts, the District of Columbia has been damaged and continues to be damaged in substantial amounts to be determined at trial.

320.     The District of Columbia is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used, or presented by Defendant Biotronik.

### Count XXXI

**DOE States' False Claims Acts That Have Not
Been Enacted or Are Not Effective at the Time of Filing
(Defendant Biotronik, Inc.)**

321.     Relator repeats and realleges each and every allegation contained in paragraphs 1 through 110 above as though fully set forth herein.

322.     This is a claim for treble damages and penalties against Defendant Biotronik under State False Claims Acts that are enacted subsequent to the filing of this Complaint, and which permit *qui tam* suits.  The States that may enact False Claims Acts are:  Alabama, Alaska, Arizona, Arkansas, Idaho, Iowa, Kansas, Kentucky, Maine, Mississippi, Missouri, Nebraska, North Dakota, Ohio, Oregon, Pennsylvania, South Carolina, South Dakota, Utah, Vermont, Washington, West Virginia, and Wyoming.

323.     By virtue of the acts described above, Defendant Biotronik knowingly caused to be presented, false or fraudulent claims to each of the States listed above.

324.     By virtue of the acts described above, Defendant Biotronik knowingly made, used, or caused to be made or used false records and statements, and omitted material facts to induce each of the States above to approve and pay such false and fraudulent claims.

325.     The State Governments of each of the States listed above, unaware of the falsity of the records, statements and claims made, used, presented or caused to be presented or caused to be made or used by Defendant Biotronik paid and continues to pay the claims that would not be paid but for Defendant Biotronik's illegal inducements.

326.     By reason of Defendant Biotronik's acts, the States listed above have been damaged and continue to be damaged in substantial amounts to be determined at trial.

327.     The State Governments of each of the States listed above are entitled to the maximum penalty for each and every false or fraudulent claim, record or statement made, used,

1 | presented or caused to be made, used, or presented by Defendant Biotronik.

2

3 | **Prayer**

4 | WHEREFORE, Relator prays for judgment against the defendants as follows:

5 | 1.    that Defendants cease and desist from violating 31 U.S.C. § 3729, *et seq.*;

6 | 2.    that this Court enter judgment against Defendants in an amount equal to three times
7 | the amount of damages the United States has sustained because of Defendants' actions, plus a civil
8 | penalty of not less than $5,000 and not more than $11,000 for each violation of 31 U.S.C. § 3729;

9 | 3.    that Relator be awarded the maximum amount allowed pursuant to § 3730(d) of the
10 | False Claims Act;

11 | 4.    that this Court enter judgment against Defendants in an amount equal to three times
12 | the amount of damages the State of California has sustained because of Defendants' actions, plus a
13 | civil penalty of $10,000 for each violation of Cal. Gov't Code § 12651(a);

14 | 5.    that this Court enter judgment against Defendant Biotronik in an amount equal to
15 | three times the amount of damages the State of Colorado has sustained because of Defendant
16 | Biotronik's actions, plus a civil penalty of $10,000 for each violation of the Colorado Medicaid
17 | False Claims Act, Col. Rev. Stat. § 25.5-4-305(1);

18 | 6.    that this Court enter judgment against Defendant Biotronik in an amount equal to
19 | three times the amount of damages the State of Connecticut has sustained because of Defendant
20 | Biotronik's actions, plus a civil penalty of $10,000 for each violation of Connecticut's False
21 | Claims Act, Conn. Gen. Stat. § 17b-301b(a);

22 | 7.    that this Court enter judgment against Defendant Biotronik in an amount equal to
23 | three times the amount of damages the State of Delaware has sustained because of Defendant
24 | Biotronik's actions, plus a civil penalty of $11,000 for each violation of Delaware False Claims
25 | and Reporting Act, 6 Del. C. §1201(a);

26 | 8.    that this Court enter judgment against Defendant Biotronik in an amount equal to
27 | three times the amount of damages the State of Florida has sustained because of Defendant

28

1   Biotronik's actions, plus a civil penalty of $11,000 for each violation of the Florida False Claims

2   Act, Fla. Stat. Ann. § 68.082(2);

3       9.     that this Court enter judgment against Defendant Biotronik in an amount equal to

4   three times the amount of damages the State of Georgia has sustained because of Defendant

5   Biotronik's actions, plus a civil penalty of $11,000 for each violation of Georgia False Medicaid

6   Claims Act, Ga. Code Ann. § 49-4-168.1(a);

7       10.     that this Court enter judgment against Defendant Biotronik in an amount equal to

8   three times the amount of damages the State of Hawaii has sustained because of Defendant

9   Biotronik's actions, plus a civil penalty of $10,000 for each violation of Hawaii False Claims Act,

10   Haw. Rev. Stat. § 661-21(a);

11       11.     that this Court enter judgment against Defendant Biotronik in an amount equal to

12   three times the amount of damages the State of Illinois has sustained because of Defendant

13   Biotronik's actions, plus a civil penalty of $11,000 for each violation of the Illinois Whistleblower

14   Reward and Protection Act, 740 Ill. Comp. Stat. § 175/3(a)(1);

15       12.     that this Court enter judgment against Defendant Biotronik in an amount equal to

16   three times the amount of damages the State of Indiana has sustained because of Defendant

17   Biotronik's actions, plus a civil penalty of at least $5,000 for each violation of Indiana False

18   Claims and Whistleblower Protection Act, Ind. Code Ann. § 5-11-5.5-2(b);

19       13.     that this Court enter judgment against Defendant Biotronik in an amount equal to

20   three times the amount of damages the State of Louisiana has sustained because of Defendant

21   Biotronik's actions, plus a civil penalty of $10,000 for each violation of Louisiana Medical

22   Assistance Programs Integrity Law, La. Rev. Stat. §§ 46.438.2 - 46.438.4;

23       14.     that this Court enter judgment against Defendants in an amount equal to three times

24   the amount of damages the State of Maryland has sustained because of Defendants' actions, plus a

25   civil penalty of $10,000 for each violation of the Maryland False Health Claims Act, Md. Code

26   Ann., Health-Gen. § 2-602(a);

27       15.     that this Court enter judgment against Defendant Biotronik in an amount equal to

28   three times the amount of damages the State of Massachusetts has sustained because of Defendant

1  Biotronik's actions, plus a civil penalty of $10,000 for each violation of the Massachusetts False

2  Claims Act, Mass. Gen. L. 12 §5B;

3      16.     that this Court enter judgment against Defendant Biotronik in an amount equal to

4  three times the amount of damages the State of Michigan has sustained because of Defendant

5  Biotronik's actions, plus the maximum civil penalty for each violation of Michigan Medicaid

6  False Claims Act, Mich. Comp. Laws §§ 400.603(1),(2) and § 400.606(1);

7      17.     that this Court enter judgment against Defendant Biotronik in an amount equal to

8  three times the amount of damages the State of Minnesota has sustained because of Defendant

9  Biotronik's actions, plus a civil penalty of $11,000 for each violation of the Minnesota False

10  Claims Act, Minn. Stat. § 15C.02;

11      18.     that this Court enter judgment against Defendant Biotronik in an amount equal to

12  three times the amount of damages the State of Montana has sustained because of Defendant

13  Biotronik's actions, plus a civil penalty of $10,000 for each violation of Montana False Claims

14  Act, Mont. Code Ann. 17-8-403(1);

15      19.     that this Court enter judgment against Defendants in an amount equal to three times

16  the amount of damages the State of Nevada has sustained because of Defendants' actions, plus a

17  civil penalty of $10,000 for each violation of Nev. Rev. Stat. Ann. §357.040(1);

18      20.     that this Court enter judgment against Defendant Biotronik in an amount equal to

19  three times the amount of damages the State of New Hampshire has sustained because of

20  Defendants' actions, plus a civil penalty of $10,000 for each violation of N.H. Rev. Stat. Ann.

21  § 167:61-b(I);

22      21.     that this Court enter judgment against Defendant Biotronik in an amount equal to

23  three times the amount of damages the State of New Jersey has sustained because of Defendant

24  Biotronik's actions, plus a civil penalty of $11,000 for each violation of  New Jersey's False

25  Claims Act, *et seq*.; N.J. Stat. § 2A:32C-3;

26      22.     that this Court enter judgment against Defendant Biotronik in an amount equal to

27  three times the amount of damages the State of New Mexico has sustained because of Defendant

28

1  Biotronik's actions, plus a civil penalty of $10,000 for each violation of New Mexico Medicaid

2  False Claims Act, N.M. Stat. Ann. §27-14-4;

3        23.    that this Court enter judgment against Defendant Biotronik in an amount equal to

4  three times the amount of damages the State of New York has sustained because of Defendant

5  Biotronik's actions, plus a civil penalty of $12,000 for each violation of New York False Claims

6  Act, N.Y. Stat. Fin. § 189(1);

7        24.    that this Court enter judgment against Defendant Biotronik in an amount equal to

8  three times the amount of damages the State of North Carolina has sustained because of Defendant

9  Biotronik's actions, plus a civil penalty of $11,000 for each violation of North Carolina False

10 Claims Act, N.C. Gen. Stat. §1-607;

11       25.    that this Court enter judgment against Defendant Biotronik in an amount equal to

12 three times the amount of damages the State of Oklahoma has sustained because of Defendant

13 Biotronik's actions, plus a civil penalty of $10,000 for each violation of Oklahoma's Medicaid

14 False Claims Act, Okla. Stat. tit. 63 § 5053.1(B);

15       26.    that this Court enter judgment against Defendant Biotronik in an amount equal to

16 three times the amount of damages the State of Rhode Island has sustained because of Defendant

17 Biotronik's actions, plus a civil penalty of $10,000 for each violation of Rhode Island False

18 Claims Act, R.I. Gen. Laws § 9-1.1-3;

19       27.    that this Court enter judgment against Defendant Biotronik in an amount equal to

20 three times the amount of damages the State of Tennessee has sustained because of Defendant

21 Biotronik's actions, plus a civil penalty of $25,000 for each violation of Tennessee Medicaid False

22 Claims Act, Tenn. Code Ann. § 71-5-182(a);

23       28.    that this Court enter judgment against Defendant Biotronik in an amount equal to

24 three times the amount of damages the State of Texas has sustained because of Defendant

25 Biotronik's actions, plus a civil penalty of $10,000 for each violation of the Texas Medicaid Fraud

26 Prevention Act, Tex. Hum. Res. Code Ann. §36.002;

27       29.    that this Court enter judgment against Defendant Biotronik in an amount equal to

28 three times the amount of damages the State of Virginia has sustained because of Defendant

1   Biotronik's actions, plus a civil penalty of $11,000 for each violation of the Virginia Fraud

2   Against Taxpayers Act, Va. Code Ann. §8.01-216.3(a);

3       30.     that this Court enter judgment against Defendant Biotronik in an amount equal to

4   three times the amount of damages the State of Wisconsin has sustained because of Defendant

5   Biotronik's actions, plus a civil penalty of $10,000 for each violation of Wisconsin False Claims

6   for Medical Assistance Law, Wisc. Stat. § 20.931(2);

7       31.     that this Court enter judgment against Defendant Biotronik in an amount equal to

8   three times the amount of damages the District of Columbia has sustained because of Defendant

9   Biotronik's actions, plus a civil penalty of $10,000 for each violation of District of Columbia

10  Procurement Reform Amendment Act, D.C. Code Ann. § 2-308.14(a);

11      32.     that Relator be awarded all costs of this action, including attorneys' fees and

12  expenses; and

13      33.     that Relator recover such other relief as the Court deems just and proper.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**Demand for Jury Trial**

2

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands a

3

trial by jury.

4

Dated:  December  XX, 2011

Respectfully submitted,

5

6

7

_____
CLAIRE M. SYLVIA (State Bar No. 138990)
cms@pcsf.com
PHILLIPS & COHEN LLP

8

131 Steuart Street, Suite 501
San Francisco, California  94105

9

Tel: (415) 836-9000
Fax: (415) 836-9001

10

11

PETER CHATFIELD
peter@phillipsandcohen.com
PHILLIPS & COHEN LLP

12

2000 Massachusetts Avenue
Washington, DC  20036

13

Tel: (202) 833-4567
Fax: (202) 833-1815

14

15

L. TIMOTHY TERRY, admitted *pro hac vice*
tim@theterrylawfirm.com
THE TERRY LAW FIRM LTD.

16

P.O. Box 2348
Carson City, NV  89702

17

Tel: (775) 883-2348
Fax: (775) 883-2347

18

19

Attorneys for *Qui Tam* Plaintiff/Relator Max
Bennett

20

21

22

23

24

25

26

27

28